[Civ. No. 3388. Third Appellate District.—September 7, 1928.]

MILWAUKEE BUILDING COMPANY (a Corporation), Respondent, v. KURT O. WETZEL, etc., Appellant.

Newlin & Ashburn for Appellant.

Isaac Pacht and Clore Warne for Respondent.

HART, J.—A petition for a rehearing was granted herein solely for the purpose of enabling us to give further consideration to the question whether the damages awarded by the judgment were, as counsel for the defendant vigorously contend is true, in excess in a material measure of the damages to which the evidence showed the plaintiff was entitled in consequence of the damage it actually sustained through defendant's breach of his contract. After a more scrutinizing examination of the evidence addressed to that question than was given to it in our original investigation of the record, we have satisfied ourselves that counsel for the defendant are right in the statement in their petition that the evidence does disclose that the plans and specifications upon which the Bayer-Rothgeb Company successfully submitted its bid after the defendant abandoned his contract with the plaintiff for doing the work and furnishing the materials called for by the said contract contained certain items which were not a part of the plans and specifications upon which the defendant submitted his bid and which increased the cost of the work and the materials over the cost thereof under the latter's contract.

We adhere to the conclusion announced in the opinion originally filed herein as to the making of the contract between the plaintiff and the defendant and the refusal by the latter to perform the terms thereof, as alleged in the complaint. The judgment, however, must be modified in accord with our modified conclusion that the aggregate sum thereby allowed the Bayer-Rothgeb Company as damages for defendant's breach of his contract is materially in excess of what the evidence shows it is entitled to. A more specific consideration of the evidence upon which the modification is predicated will be found in the body of the opinion. The following is the opinion heretofore filed herein, modified in accord with the foregoing considerations:

This is an action by the plaintiff to recover from the defendant damages for the alleged breach of a certain contract.

Judgment passed for the plaintiff in the sum of $3,131, the amount prayed for in the complaint. The defendant moved for a new trial, the same being denied. This appeal is from the judgment upon a bill of exceptions.

The plaintiff, a corporation organized and existing in pursuance of the laws of California, prior to and at the time of the commencement of this action, was and is engaged in the business of general contractor for the erection and construction of buildings, with its principal place of business in the city of Los Angeles.

The defendant, Kurt O. Wetzel, prior to and at the time of the commencement of this action, was doing business in said city under the fictitious firm name of K. O. Wetzel & Co.

At some time prior to and at the time of the commencement of this action the plaintiff was, ''and still is, engaged, as the general contractor, in the erection, building and construction of that certain building . . . at No. 806 South Broadway, in the City of Los Angeles, commonly known as the Carleton F. Burke building, according to plans and specifications provided'' in the contract for the erection and construction of the same. ''Said plans and specifications provided for the furnishing and construction of . . . certain store fronts and iron doors to store and iron front, iron doors and iron grille on the wood doors to the building lobby and iron elevator doors for two passenger elevators and other iron work to be furnished in and about said premises.'' On October 31, 1922, the defendant entered into a written agreement with plaintiff to furnish said iron or metal and to perform all work, labor, and materials necessary therefor, for the sum of $4,752, and further in said contract agreed to complete said work on or before the eighth day of February, 1923.

The complaint, from which the foregoing statement is taken, alleges that the defendant breached said contract by failing and refusing to comply with the terms thereof; that, in order to complete said building in compliance with the terms of its contract, the plaintiff ''was forced to and did secure from other persons and firms engaged in the same line of business, to wit, in the furnishing of iron and metal work and doing labor with regard thereto, such as required by the plans and specifications to be followed by this

plaintiff, bids and estimates of the best price at which they would furnish the materials and do and perform the labor necessary to install the same as per the original agreement with the defendant; . . . that the lowest bid or estimate for said materials and work was the sum of $7,883.00; . . . that plaintiff has by its contract duly made become indebted in said sum for the iron and metal work which was to have been furnished by defendant under his said contract aforesaid.'' It is alleged that by reason of the defendant's failure to comply with and perform his said contract, the plaintiff has been damaged ''in a sum equal to the difference between the sum of $7,883.00 and the sum of $4,752.00,'' the first named sum being the amount which plaintiff was compelled to pay for the material and the work because of the defendant's breach of his contract with plaintiff to furnish said material and work and the last-named sum the amount defendant agreed to furnish said material and work for, the difference between said sums being the sum of $3,131. It is further shown by the complaint that the contract of plaintiff to erect said building provided that for its noncompletion within the time specified therein the plaintiff shall be penalized in the sum of $100 for every day until completed.

The defendant's answer first specifically denies the material averments of the complaint and then sets up a special defense. The brief of counsel for the plaintiff correctly epitomizes the averments of said special defense, and we will, therefore, adopt the same herein, as follows:

''As a second and separate defense defendant alleged substantially that he had received requests for the submission of a bid for certain work, designated as Item No. 1 and Item No. 2, said request being accompanied by certain plans and specifications. That defendant submitted bids therefor, but that neither of said bids was ever accepted. The plaintiff delivered to defendant a certain 'purchase order' calling for defendant to 'furnish and install complete ornamental wrought iron and cast iron front entrance and doors, except the lobby door and frame, which are omitted as per our plans and specifications and your bid 10/31/22, $2952.' That said work order called for other and different work and material. That defendant returned said work order and requested that it be changed to conform to request for

bid, but that plaintiff refused to change said purchase order. That defendant was ready, willing and able to perform work called for in bid, and plans and specifications submitted to him at time of making, but plaintiff refused to allow him to so complete the contract. That as to Item No. 2, plaintiff never accepted bid of defendant, but that plaintiff delivered to defendant a 'purchase order,' calling upon defendant to 'furnish and install complete passenger elevators frames and doors, as per our plans and specifications and your bid 10/31/22, $1800.00.' That the original request for bid did not include any elevator 'frames.' That defendant demanded correction and elimination of item of 'frames,' but that plaintiff refused. That defendant was ready, willing and able to perform as per his bid, but plaintiff refused to allow him so to do."

The court found that the allegations of the complaint were true, and specifically found that the averments of the special defense were untrue.

The defendant contends that the findings derive no support from the evidence and that the court, in certain rulings upon the question of the legal propriety of certain evidence, committed prejudicial error.

█ The defendant first declares and contends that the finding that the parties entered into the contract for the alleged breach of which damages are asked by plaintiff in this action is afforded no support by the evidence. The finding so attacked, of course, constitutes the primary foundation of the judgment and without which the judgment, of course, could not stand.

It is not conceived to be necessary to enter herein into a minute examination and consideration of the evidence to show, as a careful review of the record has convinced us is true, that the finding that the defendant breached his contract with plaintiff is sufficiently supported. As is true in the general run of cases taken to the appellate courts, there is here a substantial conflict in the evidence upon that vital question. The presentation herein of a general statement, in synoptical form, of the testimony which supports the finding referred to should be made, and even with such a statement considerable space in this opinion will be required.

It appears, as the complaint alleges and the court found, that the defendant, on the thirty-first day of October, 1922,

submitted a bid to the plaintiff for performing the metal and iron work described in the findings hereinabove set forth for the building mentioned in the complaint, and also for the furnishing of the materials necessary for such work. The submission of this bid, it appears from the testimony of defendant (who was called as a witness for examination by the plaintiff under section 2055 of the Code of Civil Procedure), was submitted to plaintiff in response to an invitation therefor by the latter some two weeks prior to said thirty-first day of October. At the time said invitation was made, the defendant (so he testified) and M. C. Montgomery, "estimator" of the plaintiff, together "went over the plans and specifications." Defendant testified that, on said thirty-first day of October, he and Montgomery again jointly examined the plans and specifications, and that immediately thereafter on that day he (defendant) signed his bid. Wetzel further testified that his bid was reduced to writing by Montgomery in the office of the plaintiff in his (defendant's) presence; that the "figures" set forth in the bid "as they were marked down in prices had been given to them by myself over the telephone some days previous to this meeting and making out of this written document as to the price of this work." Wetzel stated that, after he was solicited to make a bid on the work and prior to submitting his bid, he prepared shop drawings of a part of the work. He stated that, on the thirty-first day of October, 1922, he went to the office of Montgomery in response to a telephone call from some party connected with the plaintiff. At that time, after stating to defendant that he had certain work for the performance of which he desired a bid from him (defendant), Montgomery proceeded to explain the character of the work to be done. Defendant testified that "in order to make it possible to make any bid at all on this work, Montgomery had a set of architectural plans . . . for the Burke building . . . and pointed out on these plans what kind of work was to be done. Then Mr. Montgomery, having absolutely no details of any kind referring to this work, had to explain to me in a positive way in what manner and in which way we should make this bid and what work was to be done and how this particular work was to be treated." Wetzel said that his business was that of a manufacturer of wrought iron and cast iron, and that he had

followed that work for twenty years; that it was not possible to determine from the architectural plans "the class of cast iron store front to be used in that building." Wetzel proceeded to testify that "in order to have a complete understanding of the class of work to be incorporated in a cast iron store front it is necessary besides the set of architectural plans to have full size details . . . which carry the exact conditions of the work as it is carried out in its actual form, size and appearance and ornamentation." Such details, he stated were not shown by the specifications to which he subscribed his name and upon which he submitted his bid. Continuing, he testified:

"Referring to the conversation with Mr. Montgomery held prior to October 31, 1922, Mr. Montgomery explained to me just in what manner they expected this front to be designed by them in time, in detail work, and in order to make a bid for it he explained what parts of the work they expected to be furnished and what parts of the work should not be considered. And as for the questions, which I have asked very many, Mr. Montgomery he has answered me. . . . In consequence of this conversation I based my price and all on this conversation. . . . At the time of this conversation with Mr. Montgomery he gave me a written paper or order, whatever you might call it, that indicated just what was wanted. There was more conversation on other work also if that is necessary to state. This is not all. And Mr. Montgomery conversed with me on this matter perhaps more than one hour and brought out all detail work about the thing and the conversation to more than one hour. He also asked me how long this work should take and all such things like that. We discussed the elevator doors, and as to what particular plans should be followed. . . . At the time that I submitted the estimate, Plaintiff's Exhibit I, or prior to that, I had examined the plans and specifications. I had a set of architectural plans given to me for figuring and I had my instructions as to the extent of the work from Mr. Montgomery and on this I made my estimate. The plans that I had were supposed to be the architectural plans, either the set in evidence or one just like it."

The bid of Wetzel was dated October 31, 1922, was addressed to "Meyer & Holler, Milwaukee Building Co.," and was in form as follows:

"Gentlemen:—I, we propose to furnish, as per plans and specifications, all labor and materials for the iron front and doors work on Burke job.

"State alternate figures, additions, omissions or discrepancies between plans and specifications:

Cast Iron Front Complete ..............$3,452.00
Deduct for Store Doors only ............ 280.00
Deduct for Store Doors frame .......... 385.00
Deduct for Lobby Doors only ........... 160.00
Deduct for Lobby Doors frame .......... 340.00
Elevator Doors as per Wetzel's details
 using Elevator Supply Co.'s Hangers 1,800.00
Elevator Doors as per M. B. Co. detail pr.
 sheet No. 13, using Elevator Supply
 Co.'s Hangers pr.................. 1,800.00

"Time limit 3 mo.

> "K. O. WETZEL CO.,
> "Signed by KURT O. WETZEL."

Wetzel testified that either on the eleventh or twelfth day of November, 1922, he received from plaintiff two written documents addressed to him (defendant) called "purchase orders," which contained a specification, in somewhat general language, of the work which he was to perform in pursuance of the terms of his bid. The first of these orders, as they are identified as exemplars in the record (Ex. 2), called for the furnishing and installation of "complete elevator 'frames and' doors as per our plans and specifications and your bid, 10/31/22, $1,800.00." This document was signed by "J. O. Graham, Manager of Construction" of plaintiff. The second (Ex. 3) likewise addressed and signed, read: "Furnish and install complete ornamental wrot and cast iron front entrance and doors, except the lobby door and frame which are omitted as per our plans and specifications and your bid 10/31/22, $2,952.00."

Accompanying the above, when sent to defendant, was a letter from the plaintiff, by "E. A. Waugh, Manager of Construction," in which it was stated: "We hand you herewith drawings Nos. 1, 2, and 3 of the Baker Iron Works covering the elevator door frames which they are furnishing on the Carleton F. Burke Bldg.; also your drawing of elevator doors

which is approved by us.'' Upon receiving said orders, Wetzel signed the specifications and plans.

Wetzel did not, after receiving the ''purchase orders,'' proceed with the carrying out of his agreement and refused to do so. Wetzel claimed that the matter of the ornamentation of the iron work as given in the specifications was too indefinite to justify any attempt to figure on definitely or safely even by estimate, and that the character thereof when finally given in detail deviated materially from the specifications as they were explained and interpreted by Montgomery in the conversation between him and the latter on October 31, 1922. There were other objections made by .Wetzel to the order (Ex. 3) for ''passenger elevator frames and doors,'' in that his bid did not contemplate elevator ''frames.'' But these matters are explained by other witnesses for the plaintiff, and their testimony will now be considered in its application to all the disputed questions of fact herein and which, as above stated, affords strong support to all the vital findings. Before doing this, however, it is well here to say that Wetzel stated that ''ordinarily the giving of an order is an acceptance of the bid—an authorization to go ahead with the work. We took those as orders.''

M. C. Montgomery, referred to above, testified to the details of the conversation with Wetzel on October 31, 1922, when the plans and specifications for the work on the Burke building on which he (witness) had asked Wetzel to submit a bid were fully discussed; that before submitting his bid, Wetzel examined the plans and specifications (marked in the record as Ex. 8) ''and after doing so he submitted a bid and signed it. The words 'iron frames and sash' (Claimed by Wetzel not included within his bid) were on the plans which were shown to Mr. Wetzel on the 31st of October. There is no change on these plans with reference to the iron work from what was on there on the 31st of October. That remains the same. I had no conversation with Mr. Wetzel along the line that he was not to do the sash. There was no understanding (as Wetzel here claims) between us that the sash was to be pine instead of iron. This is delineated as outlined upon these plans of the work which was to be done by Mr. Wetzel under his bid. We submitted these plans and specifications to other bidders in the same line of work and got bids from other people

for this very work. There were four bids including Mr. Wetzel's. He was the lowest bidder. It is not the usual practice to have detail drawings in order to bid on a job of this kind. The usual practice is to take what we call scale drawings, meaning small scale drawings, and submit them to the bidders or subcontractors for estimate, and the one that is finally successful in getting the work is then later on furnished with full sized enlarged scale details in order to actually execute the work that he has bid on. It is always presumed that there is enough information in the small scale work to render an intelligent bid. It is the same with this set of plans. . . . I submitted it to those that I had originally taken bids from at the time Mr. Wetzel bid. I submitted it to the Architectural Iron Works, the Bayer-Rothgeb Company and the Lowith Iron Works, the same firms who bid about October 31st. I submitted these very plans which were approved by Mr. Wetzel, those plans plus some details that had been made in the meantime. The work was finally awarded to the Bayer-Rothgeb Company. . . . I do not know off-hand the amount of their bid. It was more than Mr. Wetzel's bid by three thousand or four thousand, I think. The bid of the Bayer-Rothgeb Company was slightly lower than its original bid, in the neighborhood of $500 lower. The other bids which we received after February 3d were about the same as the original bids of those firms. I think they let the bids stand as I recall it just as they were. There might have been some slight modification.''

Montgomery further testified that, prior to the submission of the bid by Wetzel, he had a conversation with the latter, as to which conversation he (Montgomery) testified: ''At that conversation I told Mr. Wetzel what we desired him to bid on. I outlined the work for him in a more or less helpful way. I submitted the plans and specifications and supplemented them with explanations. I do not recall exactly the conversation, but I remember of running over the plans and specifications with him and pointing out the fact that the job was a commercial job of iron work such as is usually used in buildings of that type, and pointed out the features of the work that he was to do, the store fronts, elevators. I remember showing him the sketch of the elevator door, things which I thought might be of help in

working up a price on it. I told him with respect to the cast iron store front that it was the ordinary commercial work for that class of building. From the architectural plans that we had before us at the time it is possible to determine very closely the amount of ornamentation which will go into that cast iron work. I think the drawings or architectural plans would cover the extent of the ornamentation fairly well. It would show the general character and nature of it right on the face of it, whether it were elaborate or not on the small drawings. I remember of telling him that it would be a commercial job. In our practice, and I believe in iron work in general, we refer to a 'commercial job' as a job of the type you would use in the business district to distinguish it from a finely hand wrought and hand work forged job that might be used in very high-class residential or public work. The term does not have reference to degree of ornamentation. It would not affect that, because in casting iron the ornamentation is not an important feature, the amount of it. We did not in that conversation mention sash.'' Throughout his entire testimony, both on direct and cross-examination, Montgomery repeatedly asseverated that the whole of the work upon which Wetzel was invited to and did submit a bid was fully and in detail explained to the latter.

The witness Graham, called on behalf of plaintiff, stated: ''That he was placing the orders and contracts at the time of the Burke job, and that he was instructed by Mr. Waugh that Wetzel was going to get the orders; that the orders were drawn by him, and that he called Wetzel to the office, showed him the plans and specifications, the order and the bids; that Wetzel signed the plans and specifications, after looking at them, and took the orders with him; that Wetzel returned the following day and stated that the words 'elevator frames' appearing in the purchase order (Plaintiff's Exhibit 2) were improperly included; that he (Graham) immediately saw it was a typographical error; that Wetzel was told that the words stated did not belong there and that the Baker Iron Works had the order for the frames, and that he then scratched out the words 'frames' on Wetzel's copy and on the office copy; that Wetzel then took the orders with him again and left the office, saying that he would go ahead with the work; that he did not at that time

raise the question that the order called for wrot iron and cast iron front entrance and doors; that subsequently and about January 26 a letter was written, sending Wetzel details of the Baker Iron Works for the elevator door frames that were needed by Wetzel to complete the work; that up to that date Wetzel had not given Graham any information that he would not go ahead with the work, although he had been in the office several times between November 15 and January 26; that after the letter of January 26th was written, Wetzel came in with the orders and stated that they were not right, and left the orders with Graham, who told him that he would have to see Mr. Waugh; that later Wetzel came back to see Waugh and afterwards Graham mailed the orders left back to Wetzel.''

The witness Waugh, manager of construction for the respondent company at the time in question, testified: ''That Mr. Wetzel came to the place about the first of February; that the orders were there at that time; that Wetzel complained of the details elaborated on the plans and stated that he did not want to go ahead with the work; that he asked how they elaborated and was informed that there were two particular items objected to by Wetzel: One was the cast-iron stops and the other was the steel sash on the mezzanine floor of the front. That he then informed Wetzel that the iron stops were not a part of his contract, and that if the company wanted them he would be given an additional order to cover the item, but that the item of sash was a part of the original contract and was in the plans and specifications that had been signed. The witness Wetzel then said: 'Yes, that was the worst thing I ever did, was to sign those plans and specifications'; that Wetzel did not indicate at that conference that he would not go ahead with the work; that the Bayer-Rothgeb Company, the subsequently successful bidder who performed the work, had no other form of contract except their bid and the purchase order or acceptance.''

The witness Buxton, testifying for plaintiff, stated: ''That he was a draftsman and had been engaged in that line of work for some twenty years, and was working for respondent company at the time in question; that after November 15 he had possibly six conversations with Wetzel regarding the iron work, discussing various features of the order; that

certain changes and revisions were made pursuant to the directions of Wetzel, which were entirely in matters of detail; that in none of such conversations did Wetzel indicate that he was not going on with the contract; that there was no different work required in the details furnished Wetzel from that specified in the plans.''

The above digest of the testimony clearly shows that the contention that the finding that there was an acceptance of Wetzel's bid by the plaintiff is not supported by any evidence cannot be sustained. It is to be observed that Wetzel himself testified that ''ordinarily the giving of an order is an acceptance of the bid—an authorization to go ahead with the work.'' Furthermore, Wetzel's conduct with reference to the transaction, after receiving the orders, plainly shows that he regarded and assumed that the sending of the orders to him amounted to an acceptance of his bid by plaintiff and thus a completed contract. This testimony corresponds with that of the other parties submitting bids for the work. It was admitted by Wetzel that, in his deposition taken before the trial of this action, the main objections to the plans and specifications upon which he framed and submitted his bid revolved around the item of ornamentation—that is, that the nature and extent of the ornamentation could not be determined from said plans and specifications. In the same deposition, it was shown at the trial, Wetzel stated that certain items which he claimed were not included in his bid ''are not even of any great importance.''

But further consideration herein of the evidence in detail upon the question whether the plaintiff accepted defendant's bid is not necessary. It is enough to say that these results, which are either expressly or impliedly within the court's findings, are clearly deducible from the evidence: That defendant, upon the small scale plans or drawings and the specifications and also the conversations with Montgomery explaining the undelineated details of the work, based his bid; that the plans or drawings in their very nature contemplated extrinsic explanation of the smaller details as to ornamentation; that such a course is usual in such transactions and known so to be by those experienced in iron and structural steel work; that the plaintiff accepted defendant's bid, after which further oral explanations as to details

were made to defendant; that the latter, after such acceptance, pointed out to one of plaintiff's agents an item which was erroneously included in one of the purchase orders delivered to defendant, and that thereupon, acknowledging the error, plaintiff's agent struck out and eliminated said item from said purchase order; that at no time, when personally consulting any of plaintiff's agents about his bid after the same was ratified or accepted by the plaintiff, did Wetzel say or intimate that he did not intend to proceed with the execution of the terms of his agreement, and that he expressed no such intention until addressing to plaintiff a letter, dated February 3, 1923, to the effect that the details previously delivered to defendant by plaintiff (the purchase orders) so far deviated from "the intended work" as to justify him in declaring "your order canceled." From defendant's own testimony and his conduct with respect to the transaction, the court could expressly have found that the truth was that, after his bid had been accepted by plaintiff, he discovered and concluded that he had entered into an improvident agreement, from a financial point of view, and for that reason, and not because he was not given sufficient information as to details, etc., he resolved to repudiate his engagement. He specifically stated, it will be noted, that he based his bid on the drawings and his conversations with Montgomery.

Of course, the effect of the testimony of the defendant and his witnesses at variance with that introduced by the plaintiff upon the salient questions of fact was merely to create a conflict, and the court's findings against the defendant are, therefore, conclusive upon this court, there being nothing in the plaintiff's evidence which marks it as inherently improbable or such as to justify us in holding, as a matter of law, that it is not of sufficient probative force to uphold the decision in all respects.

The first of the several assignments of error based upon certain rulings of the court urged here grows out of the ruling denying admission in evidence on the offer of defendant of a printed form which plaintiff sent to defendant for the purpose of inserting and so specifying therein his proposal or bid for the work. The form, save certain printed words indicating the different items of which the work was to consist and as to which the bid was to be made,

was a blank and, of course, was unsigned. The ruling excluding the paper was proper. We can conceive of no service which it could render as evidence in this case. The defendant's bid and the acceptance thereof by plaintiff through or by means of the purchase orders were, as seen, introduced in evidence. These, with the conversations between the several agents of the plaintiff, particularly the conversation with Montgomery explaining the details of the work and upon which, mainly, the defendant stated he based his bid, were all that were necessary to show, at least with approximate accuracy the particular nature and extent of the work for the performance of which the plaintiff solicited the defendant to submit a bid. The blank form, therefore, could have reflected no light upon the proposition or any issue in the case.

■ It is next objected that there was error in the ruling forestalling an answer to the question to the witness Montgomery on cross-examination by defendant's counsel as to whether the words "iron frames and sash," as contained in the plans and specifications upon which defendant framed and tendered his bid (Ex. 8) "appeared upon the plans as recorded in the county recorder's office," the original plans and specifications having been filed in the recorder's office with the original contract—that is, the contract for the erection of the building between plaintiff and the owners thereof. The ruling was correct. The defendant undeniably based his bid on "Ex. 8," which, as seen, contained the words, "iron frames and sash." We cannot conceive what relevant or possible purpose the fact, if it was a fact, that said words were not indicated on the original plans could serve in the present case. It may be added that Montgomery stated that the plans recorded and the plans submitted to defendant were different in some of the matters of detail.

■ The point next urged is that it was error for the court to sustain the plaintiff's objection to the following question to defendant by his counsel: "Have you determined whether or not they (Plaintiff's Ex. 8) are similar plans to those from which you figured in order to submit your bid?" The proposition which the question was designed to establish was that the words, "iron frames and sash," which, as seen, were on "Exhibit 8," were not on the plans from which defendant made up his bid. De-

fendant elsewhere testified that those words were not on the plans according to which his bid was prepared. Counsel for defendant on page 79 of his opening brief expressly so admits, contending, however, that the question being · specific as to that matter, the ruling disallowing an answer thereto would show that the court "left out of consideration entirely that testimony in arriving at its conclusion as to what contract defendant made." The presumption is that the court, in deciding the case, considered all the relevant and material testimony received, and even incompetent testimony if it was received without objection, as was the testimony of defendant on that subject. The ground upon which the court disallowed an answer to the question was that the plans themselves were the best evidence of the fact thus sought to be shown and upon that ground the ruling was legally correct.

■ Over objection by defendant, the court permitted the witness Montgomery, in response to a question by counsel for plaintiff, to state what the bid by the Bayer-Rothgeb Company was for the work when that company submitted its bid in the first instance, in comparison with other bids then made—that is, the bid of the Bayer-Rothgeb Co. and other bids submitted in the first instance in the month of October, when defendant was the successful bidder. The purpose of this testimony was to show that the Bayer-Rothgeb bid was then substantially the same as its successful bid on the reletting of the contract in February, 1923, and also upon the matter of the measure of damages, as far as it might tend to do so, to show that the bid of said company on the reletting involved a reasonable price for the same work. We think the testimony was competent for that purpose. At any rate, the same question was elsewhere fully gone into without objection, and it was, therefore, in the record for all the purposes of the decision below.

There are two other assignments under the present head. We will not give them special notice herein, though it may be said that, even if we were required to hold that they were technically erroneous, the testimony sought to be brought out by said questions was elsewhere permitted to go into the record without objection. The rulings, therefore, were harmless in their effect upon defendant's rights, assuming, but not deciding, that they involved error.

Another question raised by the defendant here is that the award of damages was founded "upon a state of facts which the record does not support."

The rule applicable to cases such as the one here is embraced within or declared by section 3300 of the Civil Code, as follows: "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which in the ordinary course of things would be likely to result therefrom."

It was practically stipulated by and between counsel, on the close of the taking of the testimony, that the rule as to the measure of damages in the instant case is that adopted by the court in its findings and as established by the above section of the Civil Code. It is a well-established rule, at least it may be so declared so far as our own jurisdiction is concerned, that, in a case, such as the one in hand, where a party has entered into a contract with another to perform certain services and furnish materials to be used in work to be done thereunder, the stipulated contract price therefor is some evidence of the reasonable value of such services and materials, and, further, that the contract price is itself sufficient evidence of the reasonable value of such services and materials in such a case to support a finding to that effect in the absence of any evidence to the contrary. (*Bacigalupi* v. *Phoenix Bldg. etc. Co.*, 14 Cal. App. 632, [[112 Pac. 892], a case involving an action for damages for the abandonment before completion of a contract for the erection and construction of a building; see, also, *Angell* v. *Hopkins*, 79 Cal. 181 [21 Pac. 769]; *Bunting* v. *Salz*, 3 Cal. Unrep. 193 [22 Pac. 1132]; *Greenbaum* v. *Taylor*, 102 Cal. 624 [36 Pac. 957]; *Levy* v. *Scott*, 115 Cal. 39 [46 Pac. 892]; *Dunne Invest. Co.* v. *Empire State Surety Co.*, 27 Cal. App. 208 [150 Pac. 405, 411]; *Wallace* v. *Ah Sim*, 71 Cal. 197 [60 Am. Rep. 534]. But, in the application of the foregoing rule in a particular case, it must appear that the later contract is in all substantial respects similar, in terms, conditions, specifications, and total price, to the contract which has been abandoned by the party originally agreeing to do the things which such contract requires to be performed or done. In other words, the later contract, if it materially exceeds

in total price that of the original or abandoned contract by reason of the inclusion therein of certain things to be done which were not embraced within the plans and specifications upon which the abandoned contract was based, can then, obviously, be taken as evidence of the reasonable value of the work to be performed and materials to be furnished to the extent only ·that the two contracts substantially correspond with respect to the plans and specifications, or the conditions and the terms according to which the work is to be done and the materials therefor to be furnished. ■ Upon a re-examination of the evidence, we have been persuaded, as counsel for the appellant maintains is true, and as above it has been stated, that in material respects "the award of damages was founded 'upon a state of facts which the record does not support.' "

The briefs of counsel failed to particularize, with the same degree of clarity as does the petition for a rehearing of this cause, the difference, as shown by the evidence, existing between the two contracts in respect to the specifications upon which the bids were respectively submitted to the respective contractors and in accord with which said contracts were respectively made. In their petition, counsel for the defendant show in detail the several and various items not contained in the specifications upon which the defendant submitted his bid for the work to be done and the materials required for performing the work and which items were contained in the specifications according to which the Bayer-Rothgeb Co. tendered its bid and agreed to perform the work and provide the materials therefor. A careful comparison of the statement in the petition with the evidence has convinced us that the variance thus pointed out by counsel in that particular between the respective specifications is well-grounded. We will, therefore, follow in a general way the petition for a rehearing in pointing out herein the items which should be excluded from the award of damages as fixed by the judgment. These consisted of the following: 1. Cast-iron stops to hold the glass on the front of the building in position, as called for by the Bayer-Rothgeb specifications and contract, in lieu of copper stops, as provided for in the defendant's specifications and contract, and a marquee, admittedly not in the defendant's specifications, but introduced for the first time in those of Bayer-Rothgeb

Co., the excess in the cost of cast-iron stops over copper stops being from "$150.00 to $200.00," as was shown by the uncontradicted testimony of the witness C. R. Fleishman, secretary of the defendant, and the additional expense created by the introduction of the marquee into the Bayer-Rothgeb contract over and above the total price provided in the contract of the defendant, being from $15 to $20; 2. Geared hangers called for by the Bayer-Rothgeb plans, specifications, and contract instead of nongeared hangers as contained in the defendant's bid and called for by his contract, the excess in cost of geared hangers as called for by the Bayer-Rothgeb contract over nongeared hangers, as called for by the defendant's contract, being the sum of $360. The total of these, as figured by the defendant upon the basis of the minimum sums at which the two items first named (the glass stops and the marquee) are respectively estimated, is the sum of $525, in which sum the damages awarded by the judgment must be reduced.

The Bayer-Rothgeb contract, or the total price for which it was stipulated therein that said concern would do the work described in said contract and furnish the materials therefor, is itself sufficient evidence, in the absence of any evidence to the contrary, of the reasonable value of such work and materials, in so far as the same corresponds or conforms, in the character and the extent thereof with the work and the materials called for by the defendant's contract. In other words, with the elimination from the Bayer-Rothgeb contract of those items set forth in its plans and specifications and consequently contained in its contract, and which items were not shown on the plans and specifications upon which the defendant submitted his bid, the contract of the former, or the total price for which the Bayer-Rothgeb Co. thereby agreed to do the work and furnish the materials therefor, is, as it thus stands, itself sufficient evidence of the reasonable value of such work and materials, no countervailing proof upon that question having been introduced in the case.

The judgment is hereby modified by deducting from the amount of damages thereby awarded the sum of $525, and as so modified it is affirmed.

Plummer, J., and Finch, P. J., concurred.