[Civ. No. 7026. First Appellate District, Division One.—May 8, 1930.]

C. H. ALEXANDER, Appellant, v. J. C. WALLING et al., Respondents.

Gallaher & Jertberg for Appellant.

Everts, Ewing, Wild & Everts, Dan F. Conway and C. M. Ozias for Respondents.

CAMPBELL, J., *pro tem.*—On October 18, 1923, respondents J. C. Walling and Anita I. Walling, his wife, were the owners of 1263⅓ shares of the capital stock of the Valley Transit Company and on that date entered into an agreement in writing with appellant whereby they agreed to sell to appellant and appellant agreed to buy the 1263⅓ shares of stock for $266,710.25. The authorized stock of the Valley Transit Company consisted of 2,500 shares, of which at the date of the contract 1263⅓ shares were owned by respondents Walling and wife, 1083⅓ shares by appellant Alexander, 113⅓ shares by others, and the remaining 40 shares were in the treasury of the corporation. Of the 1263⅓ shares owned by respondents 613⅓ shares were owned by respondent J. C. Walling and 650 shares were owned by his wife, Anita I. Walling. The purchase price of the stock agreed to be paid was "$35,000 upon the execution of the agreement, the receipt whereof is acknowledged by the first parties (Wallings) and the balance of $231,140.25 payable as follows: $25,000.00 including interest at the rate herein mentioned on the 18th day of April, 1924, and $25,000.00 including interest semi-annually thereafter until nine installments have been made, and the balance then remaining shall be paid in full with

interest at the rate herein mentioned, six months thereafter.''

After providing that deferred payments shall bear interest at six and one-half per cent per annum and that the installment payments shall be paid from the dividends of the stock agreed ιo be sold, including that pledged as security, the agreement provides: ''It is further understood and agreed that second party (appellant) has concurrently with the execution of this agreement by proper assignment, transferred to first parties Six Hundred Thirteen and one-third (613 1–3) shares of stock held by the second party in Valley Transit Company, which shall be held by the first parties as additional security for the full performance of each and all of the terms of this contract. It is understood and agreed that second party shall have the right and privilege to withdraw any and all of said stock pledged as security for the performance of this contract, for the purpose of sale, at a price to be agreed upon by the parties hereto, except said eighty-three and one-third (83 1–3) shares hereinafter mentioned, provided the proceeds of the sale be paid to first parties to be applied to the unpaid principal, and first parties shall have the like privilege of selling and disposing of said stock of second party so pledged as security for the performance of this contract at the price of $210.00 per share and applying the proceeds of said sale as herein specified.''

In the month of February, 1924, subsequent to the date of the contract, appellant endeavored to sell and dispose of the stock in the Valley Transit Company, which then consisted of his interest in the 1263⅓ shares acquired under the contract of purchase with the respondents Walling and wife, and also of the 1083⅓ shares which he owned in his own right, subject, of course, to the pledge of 613⅓ shares thereof under the contract. With the aid of his agent Willett appellant ascertained that one O. R. Fuller of Los Angeles was a prospective buyer for the stock, whereupon in contemplation of such a sale he had several interviews with the respondent J. C. Walling prior to the time that Fuller came to Fresno from Los Angeles to negotiate for the stock.

Appellant contends—and his complaint is based upon such assumption—that at such interviews the respondents orally agreed with him that the 1263⅓ shares of stock owned by respondents might be sold to Fuller at $210 per share and

that the respondents would thereupon accept in full the entire balance due them under the contract. But the immediate payment of the entire balance under the contract would have subjected the respondents to the payment of approximately $40,000 to $45.000 in federal income taxes in addition to the income taxes they would be required to pay if they received the deferred installment payments at the times and in the manner prescribed by the contract.

On February 23, 1924, O. R. Fuller, in company with his agent Franklin D. Howell, came to Fresno for the ostensible purpose of negotiating with Alexander and Walling for the purchase of their stock in the Valley Transit Company, which included that covered by the contract and the 1083⅓ shares owned by the appellant in his own right subject to the pledge of 613⅓ shares thereof. A conference was held in the law office of Everts, Ewing, Wild & Everts in Fresno on that date, at which Mr. Fuller and his agent, Mr. Howell, Mr. Alexander and his agent, Mr. Willett, and Mr. Walling and his attorney Mr. Wild were present. The result of the conference was that no sale of the stock to Fuller was consummated.

On December 1, 1924, and prior to the commencement of the action appellant assigned, transferred and set over to W. E. Travis all of his right, title and interest in and to the Walling-Alexander contract, the consideration of such transfer being $179,291.66, payable in certain installments. Appellant claims that being able to secure but $165.50 per share for 2,346⅔ shares by this transaction, when the stock could have been sold on February 23, 1924, to O. R. Fuller, pursuant to the arrangement of appellant and respondent J. C. Walling for $210 per share, he has suffered as damages the difference between $210 per share and the price for which the stock was finally sold. The court entered judgment for defendants—respondents herein—and from such judgment appellant has prosecuted this appeal. The objections urged have to do with the findings, appellant urging that certain findings are not supported by the evidence.

The court found that plaintiff did not find a purchaser for 1180 shares of the stock or any other number of such shares for the price of $210 per share or any other price; that plaintiff and defendants never agreed upon a price for which plaintiff should sell the stock; that the stock was by de-

fendants contracted to be sold by plaintiff upon conditional sales contract with the title to the same reserved in defendants until the stock should be paid for in accordance with the terms of the contract and should remain in the possession of the defendants as sellers until such payments be made; that plaintiff did not lose an opportunity to sell any of the stock by reason of any refusal of defendants; that on or about December 1, 1924, plaintiff sold, assigned and transferred all of his right, title and interest in the contract to W. E. Travis and that the contract was thereafter by mutual agreement between W. E. Travis and defendants canceled and terminated; that at no time did defendants refuse to comply with the terms of the contract between plaintiff and defendants.

Even if appellant is correct in his contention that respondents were obligated to accept $210 per share for the stock agreed to be sold, if he produced a purchaser able, ready and willing to buy the stock at that figure, if the evidence supports the court's finding that appellant did not find a purchaser for the stock at $210 per share and appellant did not lose an opportunity to sell the stock by reason of any refusal of respondents, the judgment must be affirmed, irrespective of whether the other findings complained of find support in the evidence.

On the question as to whether O. R. Fuller, who came from Los Angeles for the purpose of negotiating for the purchase of the stock, agreed, as appellant contends, to purchase the same respondent J. C. Walling testified: "My talking with Alexander was occasioned by a question that was asked by Mr. Fuller after some other discussion: 'Well, what is your proposition this time, John? Are you assuming the position that you will or you won't take this money, the balance due—or the balance owing under your contract? But I told him that the contract I had with Mr. Alexander was perfectly satisfactory, that if I took all my money, all in cash, it would entail a very heavy burden on income tax, and relying on my contract, which I believe was clear and good, that I would not be required to take it all at one time. . . . Mr. Fuller asked me how much additional income I thought that would amount to. I asked Mr. Wild if he could give me an idea. . . . He said 'It will run between forty and forty-five thousand if you should take your money

all at one time.' . . . I told him . . . if you will pay $15,000 and Fuller would pay $15,000 in addition to the amount mentioned in the contract for the sale of the stock, I would probably deal with them and take the money and assume the rest of the loss myself . . . that was satisfactory to all with the exception that Mr. Alexander finally said he would stand ten thousand, but didn't feel like standing fifteen, and Mr. Willett appeared on the scene about that time and said that he thought that Fuller would stand ten also; if I would make it ten he thought he would put the deal over, and I told him all right go ahead and shoot on that basis . . . I remember rather distinctly the position of Mr. Fuller that he made a statement that he was interested in the deal, and he would like to see it go over. He could pay for the stock with the Motor Transit Company, Motor Terminal stock and White Motor stock and finished up with the statement to the effect 'If you don't want all cash, write your ticket. . . . He said he would pay it in three different items, three different stocks that I have mentioned, if they were acceptable to me. I told Mr. Fuller I didn't know anything about his stocks and wouldn't be interested in them. . . . He mentioned three securities, Mr. Gallaher, that I just mentioned to you, or told you about; that he could pay me in cash. He did not say that he would. He said that he could pay me in cash or that he could pay me part cash and give me these securities in addition, that he mentioned. . . . Mr. Fuller stated just before he left the office 'Well, that is a lot of money to talk about anyway. I am going back to Los Angeles to see my attorneys. I don't know just where I stand on this thing yet.' " Following this interview the record is silent as to any further offer by Mr. Fuller or negotiations with him.

While the testimony introduced by appellant is at variance with that given by respondent J. C. Walling and raises a conflict, the trial court's findings being against appellant are therefore conclusive unless we are prepared to say, which we are not, that respondent J. C. Walling's testimony is to be marked as inherently improbable or is such as to justify us in holding as a matter of law that it is not of sufficient probative force as to support the findings (*Milwaukee Bldg. Co.* v. *Wetzel*, 93 Cal. App. 775, 789 [270 Pac. 382]). The same may be said with respect to the find-

ing that plaintiff and defendants never agreed upon a price for which plaintiff should sell the stock. On this subject respondent J. C. Walling testified that appellant never told him the price for which he was offering to sell the stock; that appellant did not say he thought he could make a deal with Fuller for the stock at $210 a share, as claimed by appellant.

Appellant argues that it was evidently the intention of both parties that all of the stock should be sold when a price satisfactory to the plaintiff and sufficient to procure the defendant J. C. Walling $210 per share could be procured; that by the terms of the contract the title to the entire 1263⅓ shares of stock agreed to be sold actually passed to appellant upon the execution of the contract and that such stock was by the terms of the contract pledged to respondents as security for the performance of the obligation, and that, therefore, the provisions of the contract relating to the sale of the pledged stock apply to the 1263⅓ shares as well as to the 613⅓ shares. The court found against appellant's contention, and we are in accord with the construction placed upon the contract by the trial court.

The contract provides that the dividends accruing on the stock "agreed to be sold" and the dividends accruing on the stock "pledged as security" are to be applied by respondents upon the purchase price. It will therefore be seen that there are two classes of stock in the contract, viz.: stock "agreed to be sold," the dividends of which are to be applied upon the purchase price, and "stock pledged as security," the dividends of which are likewise to be applied upon such purchase price. It thus appears that the parties to the contract clearly had in mind these two classes of stock.

The contract further specifies that 613⅓ shares are transferred to respondents to be held as "additional security" for the full performance of the terms of the contract. Appellant argues that there could be no "additional security" unless there was other security, apparently asserting that there could be no other security unless the 1263⅓ shares were pledged. However, there was other security, which was the retention of title by respondents to the 1263⅓ shares of their stock until the purchase price therefor was fully paid. "Security is a word of broad import" (*Renton* v. *Gibson*, 148 Cal. 650, 655 [84 Pac. 186, 188]). "A security

is something which makes the enjoyment or enforcement of a right more secure or certain. . . . A security on property is where a right over property exists, by virtue of which the enforcement of a liability or promise is facilitated, or made more certain'' (*First Nat. Bank of Stuart* v. *Hollingsworth,* 78 Iowa, 575 [6 L. R. A. 92, 43 N. W. 536]).

By the succeeding clause of the contract appellant is authorized to withdraw and sell any of ''said stock pledged as security'' except 83⅓ shares thereof at a price to be agreed upon by the parties. The word ''said'' in this clause of the contract necessarily refers to the pledged 613⅓ shares referred to in the immediately preceding clause. It is again demonstrated in the following paragraph of the contract that the pledged stock consisted of but the 613⅓ shares: ''It is agreed that upon each payment of $25,000.00 upon the principal, first parties (respondents) will release to second party (appellant) 125 shares of second parties stock in Valley Transit Company which has been assigned to first parties to be held by them as security as herein mentioned until first parties have released Five hundred thirty (530)' shares, the balance of second party's stock amounting to eighty-three and one-third (83⅓) shares shall be retained by first parties as security until the total balance is paid.'' The 530 shares and the 83⅓ shares total the 613⅓ shares pledged as security.

■ We do not agree with appellant's contention that the clause of the contract providing in default of payment of installments the appellant in default was to pay the respondents all of the money is irreconcilable with the continued ownership of the stock by them and is strong proof that the 1236⅓ shares were pledged. The contract seems to have been carefully drafted to provide that in default on the part of appellant the total unpaid balance ''shall immediately become due and payable at the option of the first parties, or they may take such other and further steps as they may deem advisible.'' ■ Section 3049 of the Civil Code, which provides: ''One who sells personal property has a special lien thereon, dependent on possession, for its price, if it is in his possession when the price becomes payable, and may enforce his lien in like manner as if the property was pledged to him for the price,'' is simply declaratory of the seller's lien at common law, but limits

its enforcement by requiring him to follow the procedure required of one enforcing a pledge.  ▆  Since section 3049 relates to vendors' liens, it obviously relates only to sales in which title has passed and not to executory sales where the title is still in the seller. In the latter situation no lien exists for the reason that the vendor cannot have a lien upon personal property of which he is the owner (*Katzenbach & Bullock Co.* v. *Breslauer,* 51 Cal. App. 756 [197 Pac. 967]; *Standard Auto Sales Co.* v. *Lehman,* 43 Cal. App. 763 [186 Pac. 178]).  ▆  There being no statutory requirement as to the manner of resale when the buyer repudiates an executory contract of sale, the seller may resell at private sale, and his right to recover the difference between the market value of the goods and the contract price will not be defeated (Civ. Code, sec. 3311, subd. 2; *Gibbs* v. *Ranard,* 86 Cal. 531 [25 Pac. 64]). However, the executory seller may, if he chooses, resell according to section 3049 of the Civil Code, and the resale price is conclusive of the market value against the executory contract buyer.  ▆  A pledge is a deposit of personal property by way of security for the performance of another act (Civ. Code, sec. 2986). Every contract by which the possession of personal property is transferred, as security only, is to be deemed a pledge (Civ. Code, sec. 2987). The 1263⅓ shares of stock of respondents contracted to be sold upon certain payments being made remaining at all times in their possession cannot be construed to have been pledged.

 ▆  As to appellant's claim that it was the intention of the parties that all of the stock might be sold at $210 per share, it may be said that by the terms of the contract the only stock that could be sold at $210 per share was the 613⅓ shares actually pledged and not the 1236⅓ shares owned by respondents. Furthermore, the privilege of selling and disposing of the stock at $210 per share was by the terms of the contract conferred upon respondents and not upon appellant. That appellant recognized that any sale he made other than of the 613⅓ shares pledged as security required the sanction of respondents, is evidenced by the fact that he was willing to contribute to the increased income tax respondents would be required to pay, if they sold all of the stock at $210 per share. The meaning of the language of the contract here seems clear, but if it can

be considered doubtful, the court will call in the aid of the acts done under it as a clue to the intention of the parties (*Retsloff* v. *Smith*, 79 Cal. App. 443, 452 [249 Pac. 886]).

We have discussed this latter question not so much because we deemed it necessary to a decision of the case, but because of the seriousness with which appellant has urged it.

What we have said renders decision of the remaining objections to findings urged by appellant unnecessary as well also of considering the point made by respondents that appellant, having assigned all his right, title and interest in the contract to W. E. Travis prior to the filing of his complaint, he could not maintain the action.

The judgment is affirmed.

Tyler, P. J., and Cashin, J., concurred.