[Civ. No. 1293.   Third Appellate District.—April 21, 1915.]

## DUNNE INVESTMENT COMPANY (a Corporation), Respondent, v. THE EMPIRE STATE SURETY COMPANY (a Corporation), Appellant.

BUILDING CONTRACT — SURETYSHIP — WHEN SURETY EXONERATED.—A surety is exonerated, except in so far as he may be indemnified by the principal, if by any act of the creditor, without the consent of the surety, the original obligation of the principal *is altered in any respect,* or the remedies or rights of the creditor against the principal, in respect thereto in any way impaired or suspended, and where such is the case no inquiry will be allowed as to whether or not the surety was in fact injured thereby.

ID.—BUILDING CONTRACT—CORRECTION OF MONTHLY ESTIMATE OF LABOR DONE AND MATERIALS FURNISHED—SURETY NOT EXONERATED.— Where a building contract provides that the progress payments are to be based upon the monthly estimates of all work done and materials furnished and "paid for in the building" up to and including the last day of the preceding month, but that such estimates "are presumed to be only approximate," and subject to the correction in any subsequent monthly estimates, the owner is not entitled thereunder to authorize the issuance of any certificate upon which the

monthly payments to the contractors were to be made unless the labor performed and the materials furnished were paid for and the material in the building, but such estimates are not thereby required to conform precisely to the actual labor performed or the material furnished and paid for in the building, and if the same should include labor or materials not actually performed or furnished, the error is subject to correction in subsequent estimates, without being a departure from the terms of the contract or of the bond which insured its faithful performance.

ID.—ACTION AGAINST SURETY—SUBSTANTIALLY COMPLIED WITH CONTRACT.—In this action on a surety bond executed to insure the faithful performance of the terms of a building contract it is held that the evidence shows that the demands of the contract as to the ascertainment of the payment of bills for labor and material were substantially complied with before making payments to the contracting company.

ID.—ADVANCES TO CONTRACTORS FOR FREIGHTAGE—SURETY NOT DISCHARGED.—The surety on such a bond is not injured by the payment to the contractors of a sum of money before due to enable them to pay the freightage upon certain materials to be used in the construction of a building, where such materials were actually so used and they and the payment for their freightage actually accounted for in a subsequent estimate and payment.

ID.—CHANGES IN PLANS—SURETY NOT DISCHARGED.—Where a building contract provides that the owner might "make or require to be made any alterations, additions, omissions or substitutions in the plans, material, or workmanship which it may desire, without invalidating this contract," and further provides that should alterations or deviations from the plans and specifications involve increased, or diminished expense or require additional time to complete the building, a proper addition to or reduction of the contract price should be made and a reasonable amount of time added for the completion of the building, the surety on the bond was bound by such provision, and cannot urge that certain deviations from the plans were made without his consent, and thereby added to its liability.

ID.—INSTRUCTIONS TO JURY—RELEASE OF SURETY.—Instructions that a surety on a contractor's bond cannot claim a discharge of his obligation because of a premature payment by the owners to the contractor if he has not been harmed by such prepayment; that such surety is not relieved of his liability by reason of a change in the contract without his knowledge where changes are made wholly at the expense of the one for whose protection the bond is given and did not add to the surety's liability; that a provision in a building contract for payments on the certificates of the architect superintending the construction for the owner is for the benefit of the latter only, and that a payment made without such certificates would not constitute a premature payment if it was actually due at the time of payment, and that payment made before it was due would not re-

lieve the surety unless the latter had by reason of such payment suffered some harm or damage or the effect thereof was to increase its liability or lessen its security, correctly state the law applicable to a contractor's bond.

Id.—Abandonment of Contract—Liability of Material.—An instruction that after the contractor had ceased working on the building before its completion, and the three days' notice in writing as prescribed by the contract, of the intention of the owner to enter upon the completion of the work on a specified day, and exclude the contractor and his men therefrom, had been given by the owner to the contractor, the latter must be deemed to be in charge of the building and responsible for all materials therein until the expiration of the time so given and that if during that time any materials were removed from the building, no deductions on account of such materials could be made or allowed as against the owner, is a correct statement of the law.

Id.—Measure of Damages.—In this case it is held that the measure of damages is the difference between the contract price and the cost of the building and the loss following the delay in its completion.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order denying a new trial. Frank J. Murasky, Judge.

The facts are stated in the opinion of the court.

H. A. Van C. Torchiana, for Appellant.

Mastick & Partridge, for Respondent.

HART, J.—This is an action to recover the sum of $23,036.59 on a surety bond executed by the defendant, Empire State Surety Company, to insure the faithful performance of the terms of a building contract made and entered into between the plaintiff, as owner, and the defendants, Condon and McGlynn, as contractors, on the twenty-first day of October, 1908, at the city of San Francisco.

The Surety Company answered the complaint by denials and certain affirmative defenses, the latter involving the charge that the terms of the building contract were varied from in material respects without the knowledge or assent of the said defendant.

The other defendants defaulted.

A trial of the issues was had before a jury and a verdict awarding the plaintiff the sum of $12,219.50 returned. Judg-

ment was thereupon entered for the plaintiff in said amount.

This appeal is prosecuted by the defendant, Surety Company, from said judgment and the order denying it a new trial.

The building contract, which is a lengthy document, was entered into and executed on the twenty-first day of September, 1908, and under its terms the defendants, Condon and McGlynn, building contractors and doing business as such under the firm name of Condon & McGlynn Company, were to construct a building for the plaintiff on a lot leased by the latter, or, strictly speaking, by its assignor, and which is situated on Ellis and Stockton streets, in the city of San Francisco, for the expressed consideration of fifty-two thousand seven hundred and fifty dollars. The building provided for by said contract was to be erected and completed in conformity with plans and specifications prepared by McDonald & Applegarth, architects, which plans and specifications were annexed to and made a part of the contract. The contract provides that the contractor should enter upon the performance of said work on or after October 26, 1908, and to steadily proceed with and hasten the same to completion as rapidly as practicable, and "to deliver said work to the owner, completely finished, and free from all claims, liens or charges, on or before the 120th working day after October 26, 1908." It is further provided therein that, since, "from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage which would be suffered by the owner by a failure of the contractor to complete this contract, and the work therein provided for, within the time herein specified," the sum of fifty dollars per day should be deemed and considered as the fixed and liquidated damage suffered by said owner on account of said noncompletion, "and for each day the building is completed before the contract time a bonus of $50 shall be paid the contractor."

The contract then proceeds, and this provision is here given in full because upon its construction as a part of the bond of the Surety Company by the light of the evidence adduced, largely rests the determination of the question, which is the ultimate one submitted for decision, whether there was a material deviation from the terms of the said contract without the assent of and to the detriment of the Surety Company:

"Payments to be made after the completion of portions of the work on the first day of each calendar month, as the work progresses, in installments, based upon monthly estimates of all work done and material furnished and paid for in the building up to and including the last day of the preceding month, in sums equal to seventy-five per cent of the value of said work done and materials furnished, to be estimated by the architect, provided that no more than seventy-five per cent of the whole contract price shall be paid up to the time of completion. The balance to wit: twenty-five per cent of the whole contract price, to be paid thirty-six days after final completion of the contract and acceptance of the work covered by it, provided that when such payments of installments shall become due, and at the final completion of the work, certificates in writing shall be obtained from the architect, stating that the payment or installment is due, or the work is completed, as the case may be, and the amount then due; and shall be less the total amount of accrued liens as disclosed by the contractor, or of which the owner or architect may have received written notice, and also less the sum of one hundred dollars counsel fees, and the reasonable costs of such lien or claim. The certificate so issued by the architect shall be paid by the owner, immediately upon presentation; and a final settlement, as to the remainder and for all extras, if any, shall be had, and payment made thirty-six days after final completion of this contract and the acceptance of said work, the same to be free from all liens, charges and claims whatsoever, and the architect shall so certify in writing.

"The monthly estimates of the architect are, however, subject to correction by him in any subsequent monthly or in his final estimates. Serving merely as a basis for payment on account, they are presumed to be only approximate."

The defendant, Surety Company, furnished the usual surety bond for the faithful performance of the terms of said contract. This bond expressly made the building contract a part thereof, and expressly provides that, in case the contractors fail to complete the building within the specified time, they would pay to the plaintiff the sum of fifty dollars per day for each and every day beyond said time during which the building remained uncompleted in accordance with the terms of the building contract and the plans and specifications. It further expressly provides that it would pay to the

plaintiff any liens or encumbrances which might be placed upon said building arising by reason of the construction thereof.

The contractors proceeded with the construction of said building according to the requirements of their contract and continued with said work until the first days of July, 1909, at which time the structure was well under way, when they abandoned the contract for the reason, so the members of the firm declared, that they did not have sufficient financial means to proceed with and complete the building. Up to this time the contractors had been paid by the plaintiff on the contract price the aggregate sum of $31,397.50, said sum having been paid from time to time in installments based upon the estimates and authorized by the certificates of the above named architects.

On July 8, 1909, the plaintiff gave the contractors the written notice, prescribed by the contract, that, said contractors having failed or neglected to carry out their contract, it would, on the twelfth day of July, 1909, exclude the contractors from further connection with said work and itself take charge thereof. On the same day, the plaintiff served a formal written notice on the Surety Company of the abandonment of the contract by the contractors and of the fact of service of notice on the latter as required by the contract.

The plaintiff, through its officers, immediately thereafter took up the matter of the default of the contractors with the Surety Company through James C. Hayburn, its general agent for California, his office being in the city of San Francisco. The plaintiff submitted to Mr. Hayburn the proposition whether his company would finish the building or whether the plaintiff itself should assume control of the matter and submit the contract for the completion of the building to competitive bidders. Mr. Hornlein, president of the plaintiff, testified that Mr. Hayburn, after taking the proposition so made under advisement, "finally told us that we had better finish the building." Accordingly, the contract was submitted to a number of contractors who offered bids to do the work, and the bid of Mr. Charles Wright, a contractor, to finish the building according to the plans and specifications prepared by Messrs. McDonald & Applegarth and annexed to and made a part of the original contract, for the sum of $25,172.00, was accepted and a contract embodying the terms

of the said bid and agreement was thereafter executed, between the plaintiff and Wright, on the fourth day of September, 1909. Wright thereupon and immediately entered upon the work of completing the building and actually finished the same on the sixteenth day of November, 1909, of which fact, notice, duly verified, was given by the plaintiff.

It will be noted that, having paid Wright $25,172.00 for finishing the work, the plaintiff paid for the construction of the building, all told, the sum of $56,569.50, or $3,819.00 in excess of the original contract price.

The points made by the Surety Company on this appeal, stating them in a general way, are: 1. That the architects, who were the agents of the owner, and the owner were responsible for material departures from the terms of the contract, thus exonerating the said defendant from its obligations under its bond; 2. That the court, in its charge, misdirected the jury in matters of law; and, 3. That certain rulings upon the evidence were erroneous and damaging to the appealing defendant.

First it may be observed that it is a well-recognized principle that "the surety is favored in law, and that any act (by the obligee) injurious to his rights will operate as an exoneration under his contract." (*Bateman Bros.* v. *Mapel,* 145 Cal. 241, [78 Pac. 734]; Civ. Code, sec. 2840 sub. 2; 3 Sutherland on Damages, 3d ed., sec. 735.) He, in other words, "may stand upon the strict letter of his bond, and where the principal has, without the consent of the surety, materially violated the terms of the agreement for the performance of which the surety stands sponsor, the latter is exonerated from all liability upon his bond." (*Barrett-Hicks Co.* v. *Glas,* 9 Cal. App. 491, [99 Pac. 956].) We do not think, however, that the rule, as it is promulgated in our own law, goes as far as counsel for the appellant claim and as it was expounded very many years ago in *Miller* v. *Stewart,* 9 Wheat. 680, [6 L. Ed. 189], where the learned Justice Story said: "It is not sufficient that he (the surety) may sustain no injury by a change in the contract, or that it may even be for his benefit. He has a right to stand upon the very terms of his contract, and if he does not assent to any variation of it, and a variation is made, it is fatal."

The language of our code section, above referred to, clearly declares that the creditor or obligee must do some act with

reference to the contract to insure the faithful performance of which the surety binds himself—that is, depart from its terms in some material respect—which will prejudice the rights of the surety as such. This appears to be the sounder principle, and is based upon the idea that, while there should not be added to the liability of the surety burdens which he has not by his undertaking assumed or become responsible for, yet if any variations made in the contract by the obligee under the bond, without the consent of the surety, have not had the effect of so prejudicing the surety as to injure or impair his remedies in any degree or of lessening his security in any measure or are not in any sense inconsistent with his rights under his bond, then there does not exist, under our code, any just ground for the claim by the surety of a discharge from the obligations of his bond.

By the principles thus stated, the building contract, which constitutes the measure of the surety company's liability, must be construed and thus the specific points made in impeachment of the judgment and the order appealed from tested.

The first point made is this: That the architects, in issuing in certain instances certificates upon which the contractors obtained payments of the installments prescribed by the contract did so without first ascertaining whether the labor and materials comprehended within such certificates had been paid for by the contractors, and the materials in the building at said time. This course, it is contended, was required by the contract, and the asserted omission to follow it constituted such a variance from the contract as to release the surety.

The contract, it will be noted, provides that the progress payments were to be based upon the monthly estimates of all work done and materials furnished and *paid for in the building* up to and including the last day of the preceding month.

It will further be observed that the contract specifically provides that "the monthly estimates of the architect are subject to correction by him in any subsequent monthly or in his final estimates. Serving merely as a basis for payment on account, *they are presumed to be only approximate.*"

Thus it will be observed that it was the duty of the owner to authorize the issuance of no certificate upon which the monthly payments to the contractors were to be made unless the labor performed and the materials furnished were paid

for and the materials in the building. · The monthly estimates, however, were not supposed to conform precisely to the actual labor performed or the materials furnished and "paid for in the building." In other words, as we understand the provision now under consideration, the parties to the contract foresaw the probability of errors in the monthly estimates upon which progress payments were to be made to the contractors, and, therefore, took the pains to make special provision for and specifically authorize their correction. And this provision can mean nothing less than that, should the estimates include labor or materials not actually performed or furnished and thus a certificate for more or less than was due at a particular time was issued and payment thereupon made to the contractors of more or less than they were then entitled to, the error could be corrected and included in a subsequent estimate and certificate without impairing the legal rights or condition of any of the parties to the contract. So, if, in a particular instance, a monthly estimate made provision for the payment for labor or materials not actually performed or furnished prior to the issuance and delivery to the contractors of a certificate, the error thus committed could be rectified in a subsequent or the final estimate and certificate, as the case might be, and, if so corrected, then, obviously, it could not justly be said to be, by reason of such errors in the estimates, such a departure from the terms of the contract as would relieve the surety from the obligations of his bond, of which, as before stated, the terms of the building contract are an essential part.

But, with respect to the matter of ascertaining whether the bills were paid before the certificates were delivered to the contractors, it is believed that the demands of the contract were substantially complied with.

It was made to appear by evidence nowhere contradicted that, on all occasions, prior to the making of the estimates and the issuance of their certificates, the architects made persistent inquiry of the contractors whether the bills for the labor performed and the materials furnished were paid for and in almost all instances satisfactory results followed such inquiry. In some instances, the architects would make a similar inquiry of sub-contractors, and on several occasions, when it was discovered that bills of sub-contractors remained unpaid, the owner refused to give a check to the contractors for

the whole amount due on the installment, but insisted upon giving and did actually draw separate checks and deliver the same to such sub-contractors or the materialmen, paying over to the contractors any balance remaining over after the bills were so paid.   For instance, on the twenty-ninth day of May, 1909, the certificate of the architects called for a payment of four thousand dollars.   The owner ascertained that a number of different materialmen had not been paid, and, accordingly, paid to the contractors out of said amount the sum of nine hundred dollars, and then drew six different checks, covering the balance, in favor of as many different materialmen and delivered said checks to the latter.   As to whether the materials had been used in the building, the architects testified that they visited the building each day during the course of its construction and, as it was their duty to do, always investigated and so acquired positive knowledge of the fact that the materials as to which their certificates were in part issued were actually in the building.   Applegarth, the architect, testified that he could always readily, definitely, and conclusively determine by such an inspection as he gave the work as it progressed whether the materials were or were not used in the building.

There is, however, absolutely no evidence in the record showing, or even tending to show, that all labor and materials embraced in the certificates were not paid for, and thus the inference is exceedingly strong, if, indeed, not irresistible, not only that the owner, through its agents, the architects, fully fortified itself with knowledge of the payment of all bills for labor and materials, prior to the delivery of certificates to the contractors, but that all such bills were actually paid.

It is next contended that the sum of $1,491.12 was paid to the contractors for materials which, at the time of said payment, were not in the building and in the absence of a certificate authorizing said payments, and thus material terms of the contract were violated or departed from without the consent of the surety company and to its prejudice.

The evidence respecting this payment shows: That, although fully the sum of $1,491.42 had been earned by the contractors when the check (dated December 30, 1908), for that amount was delivered to them by the owner, the same was not then due, and the check was delivered to them without a certificate from the architects.   This circumstance was ex-

plained by the president of the plaintiff as follows: That certain materials for the building were transported to the city of San Francisco by the railroad company; that the same were at a freight station or depot of the transportation company, and that the latter refused to deliver said freight to one of the sub-contractors, to whom it was consigned, without the payment first of the freightage; that the contractors were without the means to make such payment, and that it was indispensably essential that the said materials be placed upon the ground in order that the erection of the building might be proceeded with and so completed within the time specified in the contract. This situation was explained to the officers of the plaintiff who, to facilitate progress in the erection and completion of the building, advanced said sum to the contractors in the absence of a certificate from the architects, and obviously, before the materials were in the building. It was further made to appear, however, that, on February 6, 1909, which, as will be noted, was subsequent to the advancement so made, the architects, having made an estimate of the work and materials performed and furnished for the preceding month, delivered to the contractors a certificate entitling them to the payment of the sum of $2,678.97. This certificate and the estimate upon which it was issued included the sum of $1491.42 advanced as above explained, and in honoring the certificate, the owner deducted from the amount therein specified the said sum of $1,491.42, and, accordingly, drew its check in favor of the contractors for the sum of $1,187.55, the difference, manifestly, between the sum stated in the certificate and the sum so advanced. It was further shown that the materials for the payment of the freightage on which was the purpose of the advancement of said sum of $1,491.42 were actually used in the construction of the building. These are the circumstances of the $1,491.42 transaction, and from them it is plainly apparent that by the advancement so made the rights of the surety were in nowise impaired or prejudiced. In the first place, even if it may be said that the payment was made under or within the provisions of the contract but in violation of the terms thereof for the reason that the materials were not in the building when paid for and the payment made in the absence of a certificate of the architect, the answer is that the proof shows that said materials were actually used in the building and they and the payment for

their freightage accounted for in a subsequent estimate and payment. Hence, the surety company cannot put forth a substantial claim that it was injured or its rights impaired and, therefore, cannot complain. (*Bateman Bros.* v. *Mapel,* 145 Cal. 241, 243, [78 Pac. 734].) If, on the other hand, the payment was not within the terms of the contract—if, in other words, it was a payment not authorized or prescribed by the contract—then plainly it constituted merely an advancement of money made by the plaintiff upon its own personal responsibility and "entirely without the terms of the contract," in which case the "surety has no grievance, unless in some substantial way its condition has been changed or a new liability is sought to be imposed upon him because of such payment." (*Bateman Bros.* v. *Mapel.*) And, as is manifest, the effect of the advancement was not to change the condition of the appellant as a surety or to impose upon it a new or additional liability. Indeed, the truth is that, since the materials were essential to the construction of the building, it was to the benefit of the surety company that they be procured and placed in the building at the earliest practicable moment and thus, to that extent, prevent such delay in the completion of the structure as might result in requiring said company to respond in the damages fixed by the contract for default in completing the building within the specified time.

The case of *County of Glenn* v. *Jones,* 146 Cal. 518, [2 Ann. Cas. 764, 80 Pac. 695], cited by the appellant, does not, as we understand the decision, say anything which in any way conflicts with our conclusion upon the proposition we are considering. In that case, a prepayment was made, the same not being due, and, before there was an opportunity for it to become due, the contractor, having appropriated the money so paid, abandoned his contract. The distinction between that case and this, as tested by the facts, is so plain and palpable, that we are not required to dwell further upon the proposition.

It is further urged that, in the construction of the building, certain deviations from the plans and specifications were made without the consent or knowledge of the surety company and which had the effect of materially adding to the latter's liability. The contract provides that the owner might "make or require to be made any alterations, additions, omissions or substitutions in the plans, materials or workmanship which it

may desire, without invalidating this contract,'' and further provides that should such alterations or deviations from the plans and specifications involve increased or diminished expense or require additional time to complete the building, a proper addition to or reduction of the contract price shall be made and a reasonable amount of time be added for the completion of the building. This provision was, of course, one of the covenants to which the surety company subscribed and bound itself. There is no express requirement in the contract that the surety company should be consulted or its express consent obtained for the making of any alterations in the plans and specifications, and therefore, whether the alterations made operated to increase the liability of the surety company involved a matter of evidence, and there is no evidence in the record showing that, as a result of alterations made, additional burdens were imposed upon the surety. The point cannot, therefore, be sustained.

The instructions, whose legal soundness is assailed, stated these principles: That a surety on a contractor's bond cannot claim a discharge from his obligation because of a premature payment by the owner to the contractor if he has not been harmed by such prepayment; that such surety is not relieved of his liability by reason of a change in the contract without his knowledge where changes are made wholly at the expense of the one for whose protection the bond is given and did not add to the surety's liability; that a provision in a building contract for payments on the certificates of the architect superintending the construction for the owner is for the benefit of the latter only, and that a payment made without such certificate would not constitute a premature payment if it was actually due at the time of payment; that payment made before it was due would not release the surety company unless the latter had, by reason of such payment, suffered some harm or damage or the effect thereof was to increase its liability or lessen its security; that, in this case, after the contractor had ceased working on the building before its completion, and the three days' notice in writing, as prescribed by the contract, of the intention of the owner to enter upon the completion of the work on a specified day and exclude the contractor and his men therefrom, etc., had been given by the owner to the contractor, the latter must be deemed to be in charge of the building and responsible for all materials therein until the expira-

tion of the time so given and that if during that time any materials were removed from the building, no deductions on account of such materials could be made or allowed as against the owner, it appearing that the latter did not cause such removal.

The instructions thus referred to correctly state the law applicable to a contractor's bond, as we understand and have hitherto briefly stated it herein.   The instruction last adverted to came about through evidence disclosing that, before the expiration of the three days' notice prescribed by the contract, certain materials in the building during that time and, while therefore, the building was still in charge of the contractors, and which materials were of the value of about $3,500.00, were removed therefrom.   The instruction properly stated the law as to that transaction.

The appellant also complains of the refusal of the court to give an instruction, proposed by it, which would have told the jury in effect that, if installment payments were made, even upon the architects' certificates, before the architects had ascertained that "all bills for material and labor entering into the construction of said building had not been paid," the surety company would, by reason thereof, be discharged from liability upon its bond.

The court, in lieu of said instruction, charged the jury that, before making installment payments, it. was the duty of the plaintiff to ascertain *approximately* that the work done and materials furnished for which such payments were made had previously entered into the construction of the building.   This instruction correctly states the law as applicable to the terms and conditions of the contract.

Several of the rulings of the court on the evidence are objected to and assigned as prejudicially erroneous.   We have carefully examined and considered these assignments, and, while, in a strict view, some of the rulings might be objectionable, it cannot be perceived how they could have resulted in substantial injury to the appellant, since they involved matters not of overruling importance or significance in the proof or confutation of the ultimate issues.   At all events, they are not conceived to be of sufficient force to justify a reversal of the case.   (Cons., art. VI, section 4½, as amended Stats. 1913, p. 1681; *Vallejo & Northern R. R. Co.* v. *Reed Orchard Co.,* 169 Cal. 545, [147 Pac. 238].)

Some criticism is made of the amount of the verdict, but we find no substantial merit in the criticism. The amount of damages awarded appears to be justified by the evidence. At any rate, there is substantial evidence to support it. The ground upon which the building was erected was leased by the plaintiff or its assignor for a period of twenty years at a monthly rental of one thousand five hundred dollars for the first five years and at an increased rental for each period of five years thereafter to the end of the term. The lease provided that payment of rent should begin on the first day of September, 1908. It was, therefore, important to the plaintiff to secure a complete execution of the contract within the time prescribed by the contract for its completion.

The measure of damages in this case is the difference between the contract price and the cost of the building and the loss following the delay in its completion. As seen, the contract price was $52,750.00. The cost of the building was $56,569.50, or $3,819.50 in excess of the contract price. The plaintiff was entitled to be reimbursed for this difference.

The undisputed evidence shows that, to finish the building it required 186 working days beyond the time within which the building should have been completed under the original contract, and figured upon the basis of the damages fixed or liquidated in said contract, the plaintiff was entitled, on that score alone, to an award of nine thousand three hundred dollars. The evidence further shows that the plaintiff suffered loss on account of the failure of tenants secured for the building to acquire possession thereof at the time agreed upon by reason of the unfinished condition of the building at the termination of the period of time within which the original contractors were to have finished it so that it would be ready for occupancy.

In view of the foregoing considerations, it is difficult to conceive how an award of the sum of $12,219.50 as damages may be held to be excessive or unreasonable or unsupported by the proofs.

We conclude that no legal reason has been shown for molesting the judgment and the order appealed from, and they are, therefore, affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on June 18, 1915, and the following opinion then rendered thereon:

THE COURT.—The application for a hearing in this court after decision by the district court of appeal for the third district is denied.

In denying the application we think it advisable to say that in our judgment the opinion of the district court of appeal contains some general language relative to the liability of a surety that may be misleading. A surety is exonerated in like manner with a guarantor, for section 2840 of the Civil Code so expressly provides, and a guarantor is exonerated, except in so far as he may be indemnified by the principal, "if by any act of the creditor, without the consent of the guarantor, the original obligation of the principal *is altered in any respect*, or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended." Where the original obligation of the principal is so altered, or the remedies or rights of the creditor against the principal so impaired or suspended, it is thoroughly settled by our decisions that no inquiry will be allowed as to whether or not the surety was in fact injured thereby, and the cases relied upon by petitioner here in this connection involve such a situation, as for instance, the effective granting by the creditor to the debtor of an extension of time within which to pay a note, or a material change in the terms of a contract. But the opinion of the district court of appeal sufficiently shows that the facts of this case are not such as to bring it within the provisions of section 2819 of the Civil Code. The original obligation of the principal was in no way attempted to be altered, and there was no act of the owner which in any way impaired or suspended the owner's right as against the principal. And the only provision of our Civil Code to be considered here is subdivision 2 of section 2840, as the opinion assumes. *As applied only to such a case* there is nothing in the opinion which in our judgment is erroneous.

Sloss, J., dissents from the order denying the application for a hearing in this court.