[Civ. No. 19936. First Dist., Div. One. Apr. 3, 1962.]

SAFEWAY STORES, INCORPORATED, Plaintiff and Respondent, v. MASSACHUSETTS BONDING AND INSURANCE COMPANY et al., Defendants and Appellants.

Harold C. Brown, Elton C. Lawless, John G. Evans and Lloyd J. Cosgrove for Defendants and Appellants.

Ackerman, Johnston, Johnston & Mathews and Willard S. Johnston for Plaintiff and Respondent.

SULLIVAN, J.—This is an appeal by the defendants M. J. King, a contractor, and Massachusetts Bonding and Insurance Company, the corporate surety on his performance bond, from a judgment against said defendants and in favor of the plaintiff Safeway Stores, Incorporated allowing recovery under the indemnity provisions of a written construction contract. Judgment was also rendered on the cross-complaint in favor of the surety and against the contractor as cross-defendant but no appeal has been taken from such latter judgment. We shall hereafter refer to the plaintiff as Safeway or owner, to the defendant M. J. King as contractor and to the remaining defendant as bonding company.

On December 9, 1953, Safeway and defendant King entered into a written contract for the construction by the contractor for Safeway of a new store building in Redwood City. Such contract contained a hold harmless and indemnification clause out of which this present controversy arises. It also imposed on the contractor the obligation of furnishing to the owner, at the contractor's expense, a performance bond in the sum of $204,129 written by a satisfactory surety company. Such a bond was secured from the defendant bonding company. The contractor agreed to completely perform the contract no later than 180 days from the owner's notice to commence work. By a subsequent change order, the original completion date of July 16, 1954, was extended to August 5, 1954.

Work on the job commenced in February. In accordance

with the general conditions and specifications, the contractor entered into a written subcontract with Timber Structures, Inc., for the furnishing of six wood bowstring trusses for the roof of the building to be erected complete in place with truss connections to the walls. The truss materials were delivered to the job in April for assembly and installation. Evidence was introduced below to the effect that both Soholt, the contractor's superintendent on the job, and Stevenson, Safeway's construction supervisor, thought that the truss material was of poor quality. Nevertheless, the roof trusses were erected with such materials. Four days later, on May 7, 1954, the trusses collapsed, injuring six employees of the defendant King.

The six employees thereafter instituted legal actions for damages against Timber Structures, Inc., and Safeway. King could not be joined as a defendant. (Lab. Code, § 3601.) One action resulted in a judgment of nonsuit for Safeway; four others were dismissed after a compromise settlement in connection with which Safeway paid $9,167 as its share; and the sixth action was settled after trial, Safeway paying $8,666.67 as its share. At first, the contractor offered his own counsel to Safeway and thus undertook defense of the litigation on Safeway's behalf under the indemnity provisions of the contract. Subsequently Safeway employed its own counsel, apparently because it felt that King's counsel might urge a position unfavorable to Safeway on the question of the contractor's obligation under the indemnity clause. Thus Safeway incurred loss and expense not only for the amounts paid out by it in compromise settlement of the litigation but also for legal fees and litigation expenses. In addition, Safeway incurred costs and expenses due to delay in the construction of the building for a period of 100 days.

The trial court concluded that Safeway was entitled to be indemnified under the provisions of the construction contract for all of such loss, damage and expense and accordingly rendered judgment against King and the bonding company in the sum of $40,502.37.

Defendants contend here that: (1) Safeway cannot recover upon the indemnity provisions of the contract, since it was guilty of affirmative and active negligence proximately contributing to the collapse of the building; (2) the contractor did not refuse to defend Safeway under the indemnity provisions of the contract; (3) the court committed prejudicial

error in admitting certain evidence; and (4) the damages awarded Safeway were improper. We consider these contentions in the above order.[1]

*The contractor's obligation to indemnify.*

 The construction contract provides that in its performance the "contractor shall occupy the relation of an independent contractor" and that the owner shall not be answerable or accountable for violations of laws, ordinances or regulations or for injury, death, loss or damage arising from the negligence of the contractor, his employees, subcontractors or "any person or persons whomsoever." Such clause is essentially an exemption provision. The contract then continues: "Contractor agrees to indemnify and save owner harmless from and against any and all liability, loss, costs or expenses incurred by owner in connection with or as a result of any claims, demands, actions, or causes of action that are made or brought against owner for or on account of any injury to or death of any person or for loss of or damage to any property when such injury, death, loss or damage results from or occurs in connection with the performance of this contract by contractor, his agents, employees or subcontractors." This last provision is one of indemnity. Both provisions are basically exculpatory in nature. Neither, however, specifically provides for or covers liability or loss arising from the negligence of the owner.

Such provisions are the fundament of the trial court's decision. The court found that the defendant King violated his construction contract with Safeway in the following four ways: (a) by causing roof trusses and framing to be installed which were inferior and not of the best quality; (b) by causing such installation to be made without required bracing; (c) by failing to maintain safeguards against accidents and injuries; and (d) by overloading the building in a manner that endangered its safety. As a proximate result of such violations, so the court found, the building collapsed and Safeway incurred and suffered the loss, damage and expense, which we have pointed out above. The court further found that the defendants, in further violation of the construction contract,

---

[1]Since appellants concede that the liability of the bonding company is coextensive with the liability of King, a separate consideration of the above contentions in respect to the defendant Massachusetts Bonding and Insurance Company is unnecessary.

failed and refused to indemnify and hold harmless Safeway for such loss, damage and expense and that Safeway had duly performed all provisions of the contract on its part to be performed. ■■■ The trial court concluded that the contractor was guilty of negligence proximately causing the collapse of the building and the resultant damage and loss but that Safeway "has exercised due care, and has not been guilty of negligence." The last-quoted language, although it does not specifically so state, obviously refers to the exercise of due care by Safeway in connection with the incident in controversy. Although made as a conclusion of law, it would therefore appear to be a finding of ultimate fact and sufficient as such. (*Arrelano* v. *Jorgensen* (1921) 52 Cal.App. 622, 625 [199 P. 855]; *Pierce* v. *Wright* (1953) 117 Cal.App.2d 718, 727 [256 P.2d 1049].) We will therefore consider the above quoted language as a valid and effectual finding of fact. (*Petersen* v. *Cloverdale Egg Farms* (1958) 161 Cal.App.2d 792, 797 [327 P.2d 127].) In summary, then, the trial court found that the defendant King was negligent but that Safeway was not.

Appellants concede King's negligence but contend that Safeway was guilty of affirmative and active negligence and hence was not entitled to recover from King or the bonding company on the indemnity agreement. In the face of the above findings, such contention is actually that the evidence, even though viewed by us in the light most favorable to the respondent (*Primm* v. *Primm* (1956) 46 Cal.2d 690 [299 P.2d 231]; *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427 [45 P.2d 183]) shows that Safeway was guilty of affirmative and active negligence as a *matter of law*. Indeed appellants urge that the evidence as to the installation of the trusses is "clear and uncontradicted."

The record contains abundant proof that the trusses were defective. Both Soholt, who was King's job superintendent and Stevenson, who was Safeway's representative, saw that the truss material was of inferior quality and both complained to the foreman for Timber Structures, Inc. Appellants urge that the court's finding to the effect that King caused the trusses to be installed is entirely unsupported since it appears that Safeway permitted their installation after receiving a collateral guarantee from Timber Structures, Inc. Such argument is predicated upon an exchange of letters between Safeway, through its Bramwell Construction Company division

and such subcontractor. Referring to the controversy over the trusses which had arisen between the representatives of Timber Structures, King and itself, Safeway stated that it would be unable to accept the trusses unless it received a report from a certified lumber grader that the lumber met the specifications of the job or a certificate of guarantee against failure from such subcontractor. Timber Structures responded with a letter of guarantee. Copies of both letters went to the architect for the job, to King and to Stevenson.

We must however consider the above two letters in the light of King's existing contractual obligations. Under his contract he agreed to comply with all laws, ordinances and regulations and therefore was obligated to comply with the Redwood City Building Ordinance requiring bracing of walls and structural framing during erection so as to take care of all loads and, in addition, thorough and effective angle bracing of roof framing and trussing. ▄▄ While the contract provides that the work under it "shall be performed under the direction of an authorized representative of owner" referred to as a "supervisor," it also states, as we have already pointed out, that the contractor is "an independent contractor." By its terms the contractor shall provide proper facilities for inspection by the owner and "shall, within twenty-four hours after receiving written notice from owner or supervisor, proceed to remove from the project site all materials condemned by owner or supervisor" replacing condemned with approved materials and workmanship. The contract and the general conditions of the contract impose on the contractor, King, various obligations directed to the end of producing a workmanlike job, with materials of the best quality, efficiently incorporated into the finished structure, under adequate safeguards against accident and appropriate procedures to prevent overloading of the structures. Although the sizes and calculated stresses of the roof trusses were to meet the architect's approval, the general conditions provided that the contractor was not thereby relieved of any of his obligations or liabilities. We feel that none of these obligations lost any of their contractual vitality because of the letter of guarantee from the subcontractor to Safeway.

Thus it was the contractor and not the owner who was charged with the responsibility of constructing the building. Recalled by the plaintiff as a witness under section 2055 of the

Code of Civil Procedure, Soholt, the contractor's superintend-
ent, testified that as far as any work pertaining to the con-
tractor was concerned he supervised the job and that Steven-
son, Safeway's representative, was at the job only a short time
each day ''—from one to three hours, at various—various
times.'' On cross-examination, when called by the defendant,
Soholt testified that he controlled the progress of the job
throughout. He admitted on such examination that Steven-
son never told him to go ahead and put up the trusses, and
on redirect examination by defendants' counsel, testified that
Stevenson was present when the roof trusses were going up
and objected to their going up. Although Soholt stated that
King's office did not instruct him to put up the trusses, im-
peaching evidence was introduced of his prior inconsistent
statements made in the course of the action brought by the
injured employee Shepherd, at which time Soholt stated that
he received notice from King's office to raise the trusses and
that he followed orders.

We are of the opinion that the foregoing documentary and
oral evidence supports the court's finding that King caused
roof trusses and framing of an inferior quality to be installed
in the building. The trial court could certainly infer that
the contractor who had complete control of the job and who
had entered into the subcontract for the trusses, had ordered
their installation. The court's finding that King caused the
installation, in our view, contains the implied finding that he
ordered it. Soholt's testimony that he did not receive instruc-
tions from his office to install the trusses could well have been
disregarded by the trier of fact, in the light of the impeaching
evidence proffered against it.

King's extensive obligations under the contract did not dis-
solve into thin air because Safeway received from Timber
Structures a letter of guarantee. Such letter does not neces-
sarily show that Safeway ordered the contractor to put up
the trusses. The court below could very well have concluded
that Safeway, in order to satisfy itself as to the quality of
the material and thus as to the general results of the work,
had required the letter from Timber Structures while taking
the position at the same time that it was the responsibility of
the contractor, imposed on him by the contract, to determine
whether or not he should have his subcontractor put the
trusses up. It was for the trial court to resolve the issue as

to who caused the trusses to be put up. Its finding, supported by substantial evidence, is binding here.

However, the resolution of the issue as to who ordered the installation of the trusses does not of necessity dispose of the issue of the plaintiff's negligence. Our consideration of the first issue has disclosed evidence, as we have pointed out, that Stevenson, Safeway's representative, knew that the trusses were of poor quality, discussed this matter with Soholt, joined with the latter in marking many of the timbers as inferior, and was present when the trusses were assembled and installed. Safeway had the right to notify the contractor "to remove . . . all materials condemned by owner or supervisor." The trial court's finding to the contrary notwithstanding, was Safeway guilty of negligence as a matter of law because it did not exercise its right to request removal of the trusses and instead, accepted a letter of guarantee from Timber Structures? We think not.

As a general rule, one who employs an independent contractor to perform certain work can reserve the general supervisory right to control the work so as to insure its satisfactory completion according to the terms of the contract. (*McDonald* v. *Shell Oil Co.* (1955) 44 Cal.2d 785, 788 [285 P.2d 902]; *Green* v. *Soule* (1904) 145 Cal. 96, 99-100 [78 P. 337].) As stated in the *McDonald* case, *supra*: "[T]he owner may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract—including the right to inspect (*Callan* v. *Bull*, 113 Cal. 593, 598-599 [45 P. 1017]), the right to stop the work (*Fay* v. *German General Ben. Soc.*, 163 Cal. 118, 122 [124 P. 844]), the right to make suggestions or recommendations as to details of the work (*S. A. Gerrard Co.* v. *Industrial Acc. Com., supra*, 17 Cal.2d 411, 414 [110 P.2d 377]), the right to prescribe alterations or deviations in the work (*Green* v. *Soule, supra*, 145 Cal. 96, 99-100)—without changing the relationship from that of owner and independent contractor or the duties arising from that relationship." (44 Cal.2d at p. 790.) These general principles obtain although liability may attach to the owner in various factual situations where, as *McDonald* points out, "the employee of the independent contractor was injured by some condition of the owner's premises over which the owner remained in control, and where the owner's duties to the employee were those owing to a business invitee . . . where

the owner actively interfered with or arbitrarily assumed to direct the employees of the independent contractor as to the manner and method of performing the work . . . [and] where the owner's liability for damages stemmed . . . from the allowance of work on its property constituting a nuisance.'' (44 Cal.2d, pp. 790-791.)

We are presented here with a relationship of owner and independent contractor which is governed by the general principles and does not fall within any of the exceptions set forth above in the *McDonald* case. Such relationship insulated the owner from liability for the acts or omissions of the contractor and the latter's subcontractors. No change in the relationship was effected by the owner's retention of the right of general supervision over the work. However, the right to act did not raise the duty to act. Safeway had the right to have the contractor remove materials condemned by Safeway. This did not, nor does any provision of the contract, subject Safeway to any obligation of inspecting and removing materials. No duty was imposed on Safeway to order that the roof trusses not be raised. The responsibility for the work remained at all times that of the contractor. If Safeway desired to satisfy itself as to the quality of materials which King proposed to install through a subcontractor selected by King, it had a right to do so without having to assume the responsibilities imposed on the contractor.

In summary, the finding that the defendant King caused trusses and framing of inferior quality to be installed is supported by substantial evidence. The related findings that King caused said installation to be made without requiring bracing, that he failed to maintain safeguards against accidents and injuries and that he overloaded the building in a manner that endangered its safety are all conceded by appellants to be, and from our examination of the record are, supported by substantial evidence. In addition, we are of the opinion that the finding of the court, expressed as a conclusion, that Safeway was not guilty of negligence has such evidentiary support. Since the loss, damage and expense suffered by Safeway ''results from . . . [and] occurs in connection with the performance of this contract by the contractor, his agents, employees or subcontractors'' and Safeway was not guilty of negligence of any kind, we hold that Safeway was entitled to recover against King and his surety upon the indemnity agreement.

Even if we were to assume, *arguendo,* that Safeway was negligent in not compelling the trusses to be rejected, our above holding would remain unchanged. The only negligence which could be thus posited of Safeway was merely *passive* in nature and not *active.* or *affirmative.* It is too obvious to require detailed exposition that Safeway was not actively engaged in the construction of the building. Since the trial court found that King had caused the installation of the trusses, no tenable argument can be made that Safeway did. Safeway did not order King not to put up the trusses. It had nothing to do with obtaining the trusses in the first place. Upon receiving the letter of guarantee from Timber Structures, it merely declined to exercise a general supervisory right to order their removal. Safeway's position became one of *nonaction.*

As we have already pointed out, the indemnity provisions of the contract do not specifically provide for, or cover, losses or liability arising from the negligence of the owner, active or passive. The problem thereby arising was presented and determined in *Harvey Mach. Co.* v. *Hatzel & Buehler, Inc.* (1960) 54 Cal.2d 445, 447-448 [6 Cal.Rptr. 284, 353 P.2d 924] : ''The question in the present case, as in *Vinnell Co.* v. *Pacific Elec. Ry. Co.,* 52 Cal.2d 411 [340 P.2d 604], is whether such an indemnity clause operates to exculpate the indemnitee from the consequences of its own breach of duty where the clause does not expressly state that the damage so caused is intended to be included in the coverage of the clause. The question is one of interpretation of contracts. If it can be determined that the parties intended by their agreement to protect the indemnitee against claims of damage caused by any or even all types of negligent conduct on its part, such an agreement would effectively accomplish that purpose. (*City of Oakland* v. *Oakland etc. School District,* 141 Cal.App.2d 733, 738 [297 P.2d 752] ; anno., 175 A.L.R. 8, 144-149.)''

In the *Harvey* case, the defendant contractor undertook to install electrical equipment in the plaintiff's plant then under construction. An employee of the defendant fell into an open elevator pit, was injured and thereafter commenced an action against the plaintiff Harvey. The construction contract contained an indemnity clause under which the defendant contractor agreed to indemnify and hold harmless Harvey against liability, costs and expenses for personal injuries ''sustained by any person or persons including employees of . . .

[defendants], and arising from the use of the premises, facilities or services of" Harvey. The defendant contractor refused to defend the action for Harvey on the ground that the above clause did not provide protection for Harvey against Harvey's own acts of negligence. The court decided in favor of the indemnitee, holding that where it had contracted for the complete construction of its plant and had exacted from the contractor an indemnity and hold harmless clause, and where the contractors had practical control of the structures on the premises so that any negligence for their condition would not be that of the owner alone, the accident to the employee "was one of the risks . . . against which Harvey sought to be covered" and "must be deemed to be within the contemplation of the parties" when they agreed to the indemnity clause.

The court in the *Harvey* case referred to the holding in *Vinnell Co.* v. *Pacific Elec. Ry. Co.* (1959) 52 Cal.2d 411 [340 P.2d 604]. In the *Vinnell* case the defendant railroad exacted an indemnity clause from the plaintiff contractor which was constructing a storm drain and had to excavate under the defendant's tracks. While the work was in progress, the defendant's employees negligently switched an engine so that it ran into plaintiff's excavation instead of on the temporary tracks which had been provided. The railroad admitted its negligence and the contractor's freedom from negligence. The court in the *Vinnell* case held that the indemnity clause there applicable fell short of expressing the defendant's intention to exculpate itself and that the parties there did not intend to afford protection to the indemnitee against its affirmative acts of negligence where such protection was not expressly provided.

Mr. Justice White set forth "significant factual differences" between the *Harvey* case and the *Vinnell* case: "Here the indemnitee did not continue to maintain independent operations on the premises whereon construction was in progress. The injuries did not result from some conduct or omission unrelated to the indemnitors' performance. *Most significantly of all,* the claimed breach of duty on the indemnitee's part was *not active, affirmative misconduct,* but at most *passive negligence*—a failure to act in fulfillment of a duty of care which devolved upon the indemnitee as the owner or occupier of land. Finally, the misconduct does not relate to some matter over which the indemnitee exercised exclusive control."

(*Harvey Mach. Co.* v. *Hatzel & Buehler, Inc., supra,* 54 Cal.2d
445, 448; emphasis added.)

 We are of the opinion that the facts of the case
before us present a situation analogous to that in the *Harvey*
case and require a similar holding. Here, as in *Harvey,* the
indemnitee (Safeway) did not retain independent operations
on the premises where construction was in progress. Here,
the damage or loss did not result from some conduct unrelated
to the indemnitor's (King's) performance. The negligence
of the indemnitee (which we assume, *arguendo*) is not active
or affirmative but at the most passive. Here the indemnitee,
Safeway, contracted for the complete construction of its store.
The parties knew that Safeway retained general supervisory
authority over the end result, as for example the power to
issue change orders or to order the removal of defective mate-
rials. King on the other hand agreed to be responsible for
constructing the building in a workmanlike manner. In our
view, the parties contemplated that King might violate his
obligations in this respect and cause the very accidents and
loss which occurred. It must be concluded that the parties
intended to provide for protection to Safeway for risks occur-
ring during the construction and that the damage and loss
resulting from such construction were within the contempla-
tion of the parties.

Both parties rely upon the *Harvey* case. However, as we
have explained, we feel it supports respondent's position, not
that of the appellants. Appellants also rely on *Byron Jackson
Co.* v. *Woods* (1940) 41 Cal.App.2d 777 [107 P.2d 639] and
*County of Alameda* v. *Southern Pac. Co.* (1961) 55 Cal.2d
479 [11 Cal.Rptr. 751, 360 P.2d 327]. Neither authority assists
appellants. The *Byron Jackson* case did not deal with the
question of an indemnitee's negligence, as appellants claim,
but with a claim for indemnification for acts done by the
indemnitee after the period specified in the indemnity agree-
ment, the indemnitors agreeing to indemnify for claims accru-
ing up to the time of the sale involved, but not afterward.
Appellants cite the *County of Alameda* case in support of
the proposition that the indemnitee cannot recover where he
is negligent. The *County of Alameda* case does not so hold.
It merely decides that where the parties had entered into
two specific indemnity agreements covering certain liabilities,
the court would not by implication enlarge and extend them
to other situations.

*King's refusal to defend.*

When the employees injured by the collapse of the building commenced legal actions for damages against Safeway, the latter called upon King to defend it. It is clear that under the contract of indemnity, no contrary intention appearing, King was bound to defend the actions. (Civ. Code, § 2778, subd. 4.) King contends here that he did not refuse to do so but that Safeway voluntarily undertook to assume the defense of such actions.

▪▪▪▪▪ The evidence, viewed by us in the light most favorable to the respondent discloses the following: In response to Safeway's request, King furnished his own attorney to defend Safeway. Such attorney filed answers on behalf of Safeway in the collateral damage actions. King, through such attorney, unqualifiedly accepted the obligation of representing Safeway and unqualifiedly took the position that he would defend Safeway pursuant to the indemnity agreement. Later King, through the counsel whom he had furnished to Safeway began to change his position. Discussions took place among the parties as to what such attorney considered to be the scope of his professional obligation to Safeway, since it became apparent to Safeway that he was representing King as well as Safeway. Finally it appeared to Safeway that such attorney was taking the position that, in the event it should be determined in any of the damage actions that Safeway was negligent, regardless of the character of such negligence, whether it was active negligence or not, King would deny liability under the indemnity provisions of the contract. Safeway felt that the situation thus developed presented a conflict of interests to the point where the defense of the damage actions should not be handled by the above attorney.

Arrangements were made to have attorneys of Safeway's own selection appear of record with the attorney furnished by King. We should make clear that the latter recognized the situation which had arisen and approved of the propriety of such arrangement. He remained of record throughout, but with his approval, Safeway's new attorneys undertook the actual and active defense of the actions. The attorney furnished by King was advised of their progress, but no longer actively participated in handling the defense. However, King notified Safeway after these arrangements were made, that if it made any settlements in the cases, it would be on Safeway's own responsibility.

Upon the foregoing facts, we are presented with appellants' contention that Safeway, in thereafter settling the damage actions, became a volunteer as far as reimbursement from King was concerned. We do not agree. ▋▋▋ In *Pacific Tel. & Tel. Co.* v. *Pacific Gas & Elec. Co.* (1959) 170 Cal. App.2d 387, 392 [338 P.2d 984] it is stated: "[W]here the indemnitee notifies the indemnitor of a pending claim and 'the indemnitor denies liability under the indemnity contract and refuses to assume the defense of the claim, then the indemnitee is in full charge of the matter and may make a good faith settlement without assuming the risk of being able to prove absolute legal liability or the actual amount of the damage. [Citations.] A contrary rule would make the right to settle meaningless in cases where the indemnitor has denied liability.' (*Chicago, R.I. & P.R. Co.* v. *Dobry Flour Mills* (1954) 211 F.2d 785 at 788.) This is the general rule throughout the country (see 142 A.L.R. 812). . . ." In the *Pacific Telephone* case the indemnitor refused tender of defense of a third party claim against the indemnitee. The indemnitee settled the claim and in the subsequent action on the indemnity contract, the indemnitor's argument that such settlement constituted a "voluntary" payment was rejected, the court stating at page 392: "A volunteer has been defined as a person who has made a payment (without compulsion) of a debt of a third party without request and with no promise of repayment from the party whose debt is paid. [Citations.] Here, there was the compulsion of a suit by the Pettus heirs . . . as well as a promise of repayment in the written indemnity contract. [Citations.]"

▋▋▋ In the instant case, although the indemnitor (King) originally undertook the defense of the damage actions, it later became apparent that he primarily had his own interests in mind. He took the position that he would not be liable under the indemnity provisions, if Safeway were negligent. As we have shown, King would be liable under the indemnity contract, even if Safeway were negligent, but not affirmatively or actively so. With such a misconception on King's part of his obligations under the contract, the trial court could have well believed that Safeway had good reason to conclude King was not fully representing Safeway's interests and therefore would not fully comply with his agreement. Indeed King's defense of Safeway became qualified and technical rather than fully promotive of Safeway's interests as

the agreement contemplated. From the above evidence, the court below could have reasonably inferred that King's position amounted to a refusal to defend the real interests of the indemnitee and hence a failure and refusal to perform his obligations under the indemnity contract. Safeway in no way became a volunteer. To paraphrase the *Pacific Telephone* case, it was faced with the compulsion of suits by the injured employees and had before it the promise of repayment in the indemnity contract. It always had the right to conduct the defenses of such actions, if it chose to do so. (Civ. Code, § 2778, subd. 4.) Confronted with a delicate and precarious situation which had arisen over the defense of the actions not through any act of Safeway's but in fact from King's change of position, Safeway appears to us to have acted sensibly and diligently in disposing of the problem.

*Error in admission of evidence.*

Appellants contend that the trial court committed prejudicial error, when, over objection, it "admitted the files, in addition to the pleadings, and the rulings of the trial Courts in the collateral damage actions brought against Safeway and Timber Structures." The actions mentioned are the three personal injury actions commenced by the six injured employees in Contra Costa County and referred to as the Shepherd, Thompson (including Lind and Jefferson) and Bowens (including Adams) cases. Appellants specify eleven exhibits which may be conveniently grouped as follows: (a) The County Clerk's files (except the complaints which were admitted in evidence) and the register of actions for the three above mentioned cases (Exs. 7A, 8A, 9A); (b) a group of working papers of the Safeway accountant (Ex. 15); (c) two transcripts pertaining to the Shepherd case (Exs. 17, 18) and one transcript pertaining to the plaintiff Adams (Ex. 19); and (d) four medical reports pertaining to the plaintiffs Jefferson (two), Lind and Thompson.

At the outset of the trial, the plaintiff offered the county clerk's files and the copies of the register of actions (group (a) above) to show the amount paid out by settlement or otherwise and the propriety of the expenses. The defendants apparently consented to the introduction of the complaints, but took the position that the court should first determine from an examination of the complaints and the indemnification clause whether King was bound, before pertinent files in the

actions should be received in evidence. The trial court thereupon ruled that the documents offered would be marked for identification only but would not be admitted in evidence until the court had determined King's liability under the indemnification clause. Shortly before the plaintiff rested, its counsel offered the documents in groups (c) and (d) above which were met with the same objection by defendants and were marked for identification only, the court to rule on the admissibility upon submission of the case. The original exhibits which have been brought before us disclose that the first group of documents (Exs. 7A, 8A, 9A) were received in evidence; as we read the record this would mean that the complete county clerk's files and the copies of the register of actions were in evidence. We fail to find any indication in the record or on the exhibits themselves, that the balance of the exhibits specified by appellants were actually admitted in evidence. We must assume that the trial court having decided the issue of liability against King, felt that the county clerk's files and the register of actions would, with the other evidence, amply inform the court of the propriety of plaintiff's expenses.

Appellants make two arguments against the admissibility of the documents. First, they assert that the documents were inadmissible since there was no *judgment* or *determination* in the collateral actions that Safeway *was* liable so as to charge liability to King under the provisions of subdivisions 5 and 6 of section 2778 of the Civil Code. Stated another way, it is claimed that the files in the collateral actions are admissible only if the indemnitee is adjudged to be liable in such action. Appellants furnish no supporting authority for such proposition. ▇▇▇ As we have heretofore pointed out, when there is a refusal of the indemnitor to defend actions against the indemnitee by third parties, the indemnitee may take charge of the defense of such actions itself and make settlements of them in good faith. (*Pacific Tel. & Tel. Co.* v. *Pacific Gas & Elec. Co., supra,* 170 Cal.App.2d 387.) ▇▇▇ In our opinion, the trial court properly admitted the files and register of actions of the three collateral cases, since they were relevant and material evidence to show the amounts expended and incurred by Safeway in defense and settlement, the scope and details of the litigation and thus the reasonableness and propriety of the expenditures. Any other rule, excluding such evidence, would tend to emasculate the right given the indemnitee under the *Pacific Telephone* case, *supra,* to make a

good faith settlement. Indeed, defendants appear to have taken the position during the trial that if the court found King bound by the indemnification clause of the contract, pertinent parts of the files would be admissible on the issue of the reasonableness of the payments made by Safeway.

 Appellants' second objection to the admissibility of the above documentary evidence is directed to the *Shepherd* case, where the register of actions shows a judgment of nonsuit in favor of Safeway. They argue that it was contended by Safeway and "undoubtedly held by the trial court" that the judgment of nonsuit granted Safeway in the *Shepherd* case was res judicata as to Safeway's lack of negligence in the instant case. However, appellants do not refer us to any portion of the record showing that the trial court either made such a ruling or indicated that such a holding was at the basis of its final decision. The Shepherd file and register of action, as we have pointed out, were relevant and material evidence on the amount and reasonableness of Safeway's expenditures. In the absence of some showing in the record to the contrary, it is not reasonable to assume that the trial court considered such evidence on the issue of res judicata, or decided the issue of plaintiff's freedom from negligence on the principle of res judicata, particularly when there is, as we have pointed out, other sufficient evidence in the record supporting a finding that plaintiff was free from negligence.

In view of the foregoing we therefore deem it unnecessary to discuss the authorities cited by appellants on the subject of res judicata, since it does not appear in any way that this principle was applied in deciding the case.

*Improper items of damages.*

 Finally, appellants contend that the following items allowed by the trial court were not proper damages: (a) Additional interest paid by Safeway on money borrowed by M. J. King from Crocker Bank, $1,014.01; (b) additional premium for builder's risk insurance, $84.86; and (c) additional architectural fees, $400. Appellants cite no authority whatsoever in support of such alleged error. The trial court found that by reason of the collapse of the building, its completion was delayed for approximately 100 days, as a result of which Safeway incurred the above-mentioned additional expense, costs and liabilities.

All of the items represent actual loss to Safeway. Both the additional interest and the additional premium represent prorations of the full charges, applied to the 100 day period of delay. On the additional premium, appellants argue that, since there would have been a refund, no loss was suffered. However, the item of damage represents the amount of the premium that would have been recovered, had there been no delay. Because of the delay, Safeway lost the refund. The additional architect's fees were incurred in connection with an inspection report and recommendations on the damaged building after collapse of the trusses.

The first two items of damages were due to the breach of the contract, the collapse of the building and the resulting delay. They represented damage reasonably contemplated by the parties when they entered into the contract, which by its terms fixed a date for King's completion of the work. The additional architect's fees were made necessary by the collapse of the trusses and the consequent damage to the building. Certainly such item of damage was proximately caused by the contractor's breach. All three items of damage were then properly allowed by the trial court. (Civ. Code, § 3300; *Dunne Inv. Co.* v. *Empire State Surety Co.* (1915) 27 Cal. App. 208, 222 [150 P. 405, 411]; *Hale Bros.* v. *Milliken* (1907) 5 Cal.App. 344, 352 [90 P. 365].)

The judgment is affirmed.

Bray, P. J., and Tobriner, J., concurred.

A petition for a rehearing was denied April 16, 1962, and appellants' petition for a hearing by the Supreme Court was denied May 29, 1962.