The **AMERICAN INSURANCE COMPANY, a corporation, Plaintiff,**

v.

**HERITAGE CONSTRUCTION CORPORATION, a corporation et al., Defendants.**

No. 42328.

United States District Court
N. D. California, S. D.

Dec. 22, 1965.

Order May 11, 1966.

Arthur M. Bohnert, Jr., of Bohnert, Dingus & McCarthy, San Francisco, Cal., for plaintiff.

Boris H. Lakusta, E. Myron Bull, Jr., David C. Phillips of Graham, James & Rolph, San Francisco, Cal., for defendants.

## MEMORANDUM OF DECISION

SWEIGERT, District Judge.

Plaintiff, the American Insurance Company, a New Jersey corporation engaged in the business of issuing construction faithful performance and mechanics' lien surety bonds in California, commenced this action on May 1, 1964, against defendants, Heritage Construction Corporation and others, residents of California engaged in the improvement of certain real property in San Mateo County, for a decree declaring that plaintiff has no liability to defendants under a certain surety bond hereafter mentioned, and that defendants are liable to plaintiff for any sums plaintiff may be required to pay thereunder to labor, material or subcontractor claimants.

Jurisdiction is invoked under the diversity jurisdiction of this Court.

The case is before the Court following a trial by the Court of the issues raised by the pleadings and by a pre-trial order filed herein August 6, 1965.

The following facts are either undenied or found by the Court from the evidence in the case:

On August 16, 1962, defendants entered into a contract (Plaintiff's Ex. 2) with Ervin P. Varwig whereunder Varwig undertook to construct certain offsite improvements on a real estate tract in San Mateo County known as Mills Estate No. 24.

The Contractor, Varwig, had furnished a contractor's surety bond dated August 15, 1962 (Plaintiff's Ex. 1) issued by plaintiff herein, for Varwig's faith-

ful performance of the construction contract and for his payment of all labor, material and subcontractor's claims on the job.

Varwig commenced work on August 16, 1962 and physically completed his work in December, 1963. On March 25, 1964, defendants received information to the effect that one of Varwig's subcontractors intended to file a mechanics' lien and subsequently received similar information from other subcontractors and materials men.

By letter of March 31, 1964, defendants gave notice to plaintiff surety company that the contractor had defaulted in his payment of labor, material and subcontractor claims. A similar letter notice, dated April 3, 1964, was delivered by hand to plaintiff on that date.

By May 1, 1964, it was discovered that a total of $115,000 of labor, material and subcontractor claims for work on the job remained unpaid by Varwig.

Plaintiff surety company refused to acknowledge liability for these claims.[1]

Instead of paying them, plaintiff commenced this action alleging in substance and effect that defendants had failed to comply with the terms and conditions of the surety bond in that: (1) Defendants and Varwig did not abide by the terms of the construction contract, as required by the surety bond, but instead altered the terms of the construction contract in that premature payments were made by defendants to Varwig; (2) Defendants failed to notify plaintiff of the default of Varwig within the time required by the surety bond.

Disposing first of plaintiff's contention that defendants failed to give notice of Varwig's default within the time provided by the surety bond, the evidence so clearly establishes that defendants did give timely notice that plaintiff has not bothered to pursue in post trial briefs its contention to the contrary.

The Court, therefore, finds from the evidence that defendants did on March 31, 1964, and on April 3, 1964, give written notice of the principal's (i. e., Varwig's) default and that said written notice was given as promptly as possible and also within ten days after such default became known to defendants or to their representatives authorized to supervise performance of the construction contract—all within the meaning of and in compliance with Condition First of the surety bond.

Plaintiff's next contention is that defendants did not abide by the terms of the construction contract, as required by the surety bond, in that certain progress payments were prematurely made.

Condition Second of the surety bond issued by plaintiff (Plaintiff's Ex. 1) provides as follows:

"Second: That the Owner shall faithfully perform all of the terms, covenants and conditions of such contract on the part of the Owner to be performed; and shall also retain the last payment and all reserves and deferred payments until the complete performance of said contract, and until the expiration of the time within which notice of claims or claims of liens by persons performing work or furnishing materials, appliances, teams or power under said contract may be filed, and until all such claims shall have been paid, unless the Surety shall consent, in writing, to the payment of said last payment, reserves or deferred payments."

The construction contract (Plaintiff's Ex. 2) provides under General Conditions, p. 10, Section VIII, Par. 2, as follows:

"*PARTIAL PAYMENTS:* It is hereby stipulated and agreed that the First Party shall once each month cause an estimate in writing to be made by the Engineer of the total amount of work

---

[1]. Pending this litigation the plaintiff surety company paid out the sum of $61,900 on account of lien claims but said payment was made under stipulation that it was without prejudice to its rights asserted herein. Pending the litigation, defendants have either paid or settled lien claims in the amount of $20,483. There are still known, unpaid lien claims in the amount of approximately $3,500.

done at the time of such estimate, and the value thereof. The First Party shall retain ten per cent (10%) of such estimated value as part security for the fulfillment of this Contract by Contractor, and shall monthly pay to the Contractor the remaining ninety per cent (90%), after deducting therefrom all previous payments and other sums to be retained under the terms of this Contract. No estimate or payment shall be made when, in the judgment of the Engineer, the work is not proceeding in accordance with the provisions of this Contract or when the total value of the work done since the last estimate amounts to less than one thousand dollars ($1,000)."

Plaintiff contends that, among the progress payments made to Varwig (See Plaintiff's Ex. 4), a payment of $64,750.-95 to the Contractor on October 31, 1962, was a premature payment and a departure from the construction contract in that it was not a "once each month" payment, as required by the contract, because the work started on August 16, 1962; Varwig received a first payment of $21,798 on September 14, 1962, a second payment of $56,282.40 on October 17, 1962 and this third payment of $64,-750.95 less than a month (i. e., 14 days) thereafter.

The evidence shows, however, that none of these three payments exceeded 90% of Varwig's progress billings and that, in fact, after the October 31, 1962 payment, the accumulated retentions were still far in excess of the required 10% retention.

The absurdity and extreme technicality of this contention are manifest when one observes that the October 31st payment might even have been properly made concurrently with the previous October 17th payment without reducing the progress retention below the required 10%.

The Court holds and finds that neither this October 31st payment, nor any of the other progress payments made by defendants, substantially altered or breached the construction contract.

Plaintiff next contends that defendants failed to retain 10% of *all* progress payment claims presented by Varwig, as required by the same Section VIII, Par. 2 of the construction contract, in that defendants retained 10% of only the original unit bid amounts and did not retain on the basis of actual "as built" amounts.

In explanation of this contention it should be noted that the contract contains a Bid Schedule—Items A-1 through A-69—setting forth the number of units for each item for which the contractor gives an item bid price based on the stated number of units. The contract also provides, however, (General Conditions, Sec. II, Par. 1), that the number of units set forth in these items are approximate only; that the owner is not bound to these quantities; and that the owner reserves the right to increase or decrease the amount of any class or portion of the work. In case of such increase or decrease, the contractor's progress claims and ultimate "built-in" cost would be varied accordingly.

The total original bid for Items A-1 through A-69 was $641,000, but the ultimate "as built" cost turned out to be $687,859.17, about $46,759 more than the original bid. Retention of 10% on this excess cost would amount to about $4,-675 and the total retention, if retention on an "as built" basis was required, would amount to $68,785.

The witness Cook testified that Varwig's progress billings were always checked and approved by defendants' Engineers as to the value of the work done at the time, then forwarded to the Fullerton, California bookkeeping office of defendants, where a check was prepared under arrangements with defendants' lending agency, Citizens Federal, which insisted on a retention of 10% of the contractor's total billings and that the checks were never more than 90% of the amounts shown by the Engineer's report on these billings.

Since the Varwig progress bills, and the Engineer's approvals, thereof, necessarily reflected the work "as built," rather than the original bid amounts, it fol-

lows that 10% was in fact retained on an "as built" basis.

Defendants, however, according to the pre-trial order, p. 2, admit holding only $64,100 as a retention fund, contending that, since defendants' surety bond was written on a basis of $641,000, the retention to which the surety was entitled should be computed on that basis, rather than on the basis of the "as built" progress value of the work done.

■ However, the contract, Section VIII, Par. 2, explicitly requires retention of 10% of the total amount of work done (under Items A–1 through A–69) of the contract according to the Engineer's estimate of the value of the work done at the time of the estimate. The value of the work done, as estimated by the Engineer, is, therefore, the test— even though the number of units set forth in the contract under said Items may have been increased or decreased. Thus, the surety is entitled to the full retention of $68,785 on the "as built" basis.

Plaintiff next contends that defendants, although they retained 10% of "as built" cost of the contract items, failed to retain 10% of payments made to the contractor for so-called "extra work" and that such failure constitutes non-compliance with the requirement of the surety bond that defendants will faithfully perform the terms, covenants and conditions of the construction contract.

According to the evidence this extra work totaled $43,143 and, if the 10% retention provision of the contract is applicable thereto, $4,314 should have been retained in addition to the $68,785, making a total retention of $73,099.

So far as so-called "extra work" is concerned, that subject is specifically covered in General Conditions, Section IX, Par. 2, of the construction contract which provides that "new and unforeseen items of work shall be classed as extra work when they cannot be covered by any of the various items or combinations of items for which there is a bid price." This provision further states that all bills for extra work done in any month shall be filed in writing with the Engineer and that for such extra work "the contractor shall receive compensation based on prices previously agreed upon in writing." There is no mention in Section IX, Par. 2 of any retention from payments for extra work.

The term "work" is defined in the contract (General Conditions, Section I, Definitions (8)) as "all the work shown and called for in the Standard Specifications and Special Conditions forming a part hereof, the proposal, the contract and as indicated on the plans."

As far as the terms of the contract are concerned, "extra work" does not fall within this definition of "work" because extra work, being work so "new and unforeseen" that it cannot be covered by any of the various items for which there is a bid price, obviously is not shown or called for in the specifications, special conditions, proposal or plans.

It is work performed outside the contract, work which the contractor could not be compelled to perform without a new agreement and additional compensation.

■ The Court, concludes, therefore, that the retention provisions of Section VIII, Par. 2, do not apply to extra work performed under Section IX, Par. 2.

■ Even if the contract be deemed ambiguous upon the point, the practical construction placed upon it by the parties should be considered in its determination.

Further, evidence introduced at the trial through the testimony of Boone, Secretary-Treasurer of defendants, was to the effect that it is a general custom of the industry not to retain on payments for this so-called "extra work." The witness, Roeben, assistant secretary of defendants, testified to the same effect. The witness Cook testified that, although he was not sure of the general custom, it had been his practice to never make retentions on extra work.

On the other hand, plaintiff's witness Russell testified that it was the custom

of the industry to retain on all work performed including extra work.

The Court finds and concludes that this evidence should be resolved in favor of defendants.

Plaintiff next contends that a $40,000 payment made by defendants to Varwig on February 28, 1964, was made in violation of Par. 3 of Section VIII, of the contract and also in violation of Condition Second of the surety bond above set forth.

Par. 3 of Section VIII provides that the owner, upon acceptance of the work shall file a notice of completion and pay the contractor the entire sum due, after deducting all previous payments and all amounts to be retained under the contract, provided there have been no claims filed against the amount due the contractor. It further provides, however, that the final payment shall not be due and payable until the expiration of 35 days from the filing of notice of completion.

Condition Second of the surety bond, already quoted, provides that the owner shall retain the last payment, and all reserves and deferred payments, until the complete performance of the contract and until expiration of the time within which notice or claims of liens may be filed and until all such claims have been paid.

Cal.Code Civ.Proc. §§ 1193.1(e) and 1184.1 provide in effect that for offsite work of the kind here involved, the completion of such work shall be deemed to be the date of acceptance by the public authority—in this case acceptance of the work by the City of Millbrae which acceptance was not forthcoming until March 17, 1964.

It follows, therefore, that the final payment was required to be retained until at least 35 days thereafter, i. e., until April 17, 1964.

Defendants concede the making of this $40,000 payment to Varwig on February 28, 1964; further, that they were obligated to retain 10% of the value of the work done until the expiration of the time for filing mechanics' liens which in this case would be at least April 17, 1965; further, that this payment, if considered to have been a premature payment out of the final retention fund would reduce the retention below the required 10 per cent.

Defendants contend, however, that this $40,000 was not a payment out of the retention fund, but an advance to Varwig outside of and apart from the contract; that defendants did in fact retain, and did not disburse this $40,000 advance from a 10% retention fund on billings on the job which defendants were required by their own financing agency, Citizens Federal, to maintain, and did maintain, on deposit with Citizens Federal.

Defendants have stated in the record that they have been at all times and now are ready, able and willing to credit plaintiff surety company with, and pay to it, if necessary, $64,100 of this retention fund together with the amount of any additional retentions determined by the Court to be required under the contract.

Plaintiff, however, takes the position that these alleged alterations and breaches by defendants of the construction contract, and of surety bond requirements, have the effect under California law applicable to this case [Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)], of completely exonerating plaintiff surety company from its obligations to defendants, citing Cal.Civ. Code §§ 2819 and 2821; Pacific Coast Eng'r Co. v. Detroit Fid. & Sur. Co., 214 Cal. 384, 5 P.2d 888 (1931); First Congregational Church of Christ in Corona v. Lowrey, 175 Cal. 124, 165 P. 440 (1917); County of Glenn v. Jones, 146 Cal. 518, 80 P. 695 (1905); Phoenix Indem. Co. v. Nicholas, 121 F.Supp. 168 (N.D.Cal.1954).

Cal.Civ.Code § 2819 provides: "A surety is exonerated * * * if by any act of the creditor, without the consent of the surety the original obligation of the principal is altered in any respect * * *."

Cal.Civ.Code § 2821 provides: "The rescission of an agreement altering the

original obligation of a debtor, or impairing the remedy of a creditor, does not restore the liability of a surety who has been exonerated by such agreement."

In Pacific Coast Eng'r Co. v. Detroit Fid. & Sur. Co., supra, the Court considered the question of a premature payment made to a contractor and, after a review of the California cases, held that in this particular case the payment did exonerate the surety.

The Court in the *Pacific Coast* case, supra, however, distinguished cases in which the alleged premature payment is one upon which the plaintiff is relying and dependent upon for a recovery against the surety, and cases in which the plaintiff is not so relying or dependent. The Court in Pacific Eng'r Co. v. Detroit Fid. & Sur. Co., supra, thus distinguishes such cases as Bateman Bros. v. Mapel, 145 Cal. 241, 78 P. 734 (1904); Dunne Inv. Co. v. Empire State Sur. Co., 27 Cal.App. 208, 150 P. 405, 411 (1915); Mazzera v. Ramsey, 72 Cal.App. 601, 238 P. 101 (1925).

▮ It is therefore, California law that, where the owner's action is not predicated on an advance made to the principal, the payment is deemed to have been made outside the terms of the contract and not to constitute an alteration of the principal's obligation and that in such case the surety is exonerated only if the payment has injuriously affected the surety's rights. 46 Cal.Jur.2d Suretyship & Guaranty § 93.

In Bateman Bros. v. Mapel, 145 Cal. 241, 78 P. 734 (1904) the Court made clear the distinction between payments made under the contract and mere advancements of money to the contractor outside the terms of the contract stating at 244, 78 P. at 736:

"Thus the question whether the advancements made by Bateman Bros. were or were not within the strict terms of the contract could only affect the surety if, in fact, they were improperly made, and if a recovery was sought against the surety because of them, or because of some other change

in its condition because of them. But such is not this action. Plaintiff does not plead the payments. He bases no claim for a recovery upon them, and the surety can avail himself of them to defeat a recovery only if the making of them has prejudiced him * * *."

In the pending case Varwig testified, concerning the February 28, 1964 $40,000 payment, that he told Boone, Secretary-Treasurer of defendants, that he had done his job and needed the money and that Boone gave him a check. The evidence further shows that this check, unlike other payments to Varwig, made no reference to any particular bill, statement or invoice.

Boone, and also the witness Cook, testified that this payment was an advance to Varwig out of defendants' general funds; that it was not made out of the retention fund which, in fact, remained on hand for defendants' account with its lending agency, Citizens Federal; that this retention fund still remained on hand, so far as the relationship between defendants and plaintiff surety company is concerned, and, that defendants acknowledged that it must be applied to lien claims.

▮ Upon the evidence, the Court finds that the $40,000 payment of February 28, 1964, was a payment outside the construction contract, rather than an alteration or breach of it or a prepayment exonerating the surety within the meaning of the law of California.

For another, separate reason this $40,000 payment should not be held, under California law, to completely exonerate the surety. One of the reasons for the rule that premature payments exonerate the surety is that such payments eliminate or reduce the incentive of the contractor to complete the job. Calvert v. The London Dock Co., 2 Keen 638 (1838); U.Pa.L.Rev. 842 (1932); Simpson, Suretyship § 78 (1950); 20 Calif. L.Rev. 571 (1932). This may be true with respect to premature payments during performance of the contract and this rule of Calvert v. The London Dock Co., supra, has been applied in that kind of

case. Such was the situation in the cases relied on by plaintiff, e. g., Pacific Coast Eng'r Co. v. Detroit Fid. & Sur. Co., supra; County of Glenn v. Jones, supra; Phoenix Indem. Co. v. Nicholas, supra.

In the pending case, however, defendants do not seek to hold that surety company on its assurance that the contractor would faithfully complete the job. Varwig had completed the job two months before the $40,000 payment.

Assuming his further obligation to also pay his laborers, material men and subcontractors, the question whether further withholding of a final payment from a contractor, who has physically completed his job, is an incentive to the contractor to pay off outstanding labor, material men and subcontractors, is questionable to say the least. The result of any such withholding is generally to the contrary, especially when the contractor is not in a financial position to pay off his laborers, material men or subcontractors until he had the final payment funds in hand.

When a surety bond assures, as in this case, not only faithful performance of the work by the contractor, but also payment of mechanics' lien claims, the purpose of requiring further retention by the owner, *after* faithful performance of the job, of a stipulated amount until expiration of lien time is, not to provide an incentive to the contractor to pay off lienable claims himself, but to give the owner and the surety company an agreed amount of financial security for that purpose in case the contractor does not pay them off.

From an examination of California law we conclude that it has not been held, and will not be held, that a premature payment or advance from the lien period retention fund after the job has been fully completed, completely exonerates the surety. In such situation, under California law as well as the law of the great majority of states, the effect of the premature advance from the retention fund could at most exonerate the surety only to the extent of the premature release of the security fund which the surety stipulated should be kept on hand pending the lien filing period. The owner, in such case, would have to reimburse the retention fund.

However, it is not necessary to rest our holding in this case upon that ground. For, this Court has found that defendants did not disburse the $40,000 from the required security fund and that such fund is now available to plaintiff surety company; that defendants merely made an advance outside the contract which, unless it can be recovered from Varwig, will be an out of pocket loss only to defendants—not to plaintiff surety company which has the full benefit of the agreed 10% security fund—$68,785.

Defendants will prepare, serve and lodge with the Court findings of fact, conclusions of law and a judgment in accordance with the views herein set forth.

### ORDER

On December 22, 1965, this Court filed its Memorandum of Decision holding that defendants did not substantially alter or breach the terms and conditions of a surety bond issued by plaintiff, and therefore, plaintiff was liable to defendants upon said bond. The Court, however, found that the plaintiff was entitled to a retention fund of 10 per cent of the "as built" cost or $68,785.00 as opposed to defendants' contention that plaintiff was only entitled to a retention fund of 10 per cent of the basis upon which the bond was written or $64,100.-00.

In said Memorandum the Court did not rule on defendants' request that attorneys' fees in this action and in the defense and settlement of lien claims and lien foreclosure suits brought by unpaid subcontractors be awarded to it. Subsequent to the above decision, both parties have filed briefs at the request of the

**344**

Court on the question of whether defendants are entitled to attorneys' fees.

This Court has jurisdiction of the subject matter and the parties under the diversity jurisdiction of the Court, 62 Stat. 930 (1948), as amended, 28 U.S.C. Sec. 1332(a) (1) (1964). Defendants, however, contend that this Court can award attorneys' fees, not only if California law so authorizes, but as an "inherent power" of this Court sitting in equity. Plaintiff on the other hand, contends that unless California law permits an award of attorney fees, such an award is not authorized.

## ATTORNEYS' FEES INCURRED IN THE DEFENSE AND SETTLEMENT OF LIEN CLAIMS

■ This Court is satisfied that California law allows the owner to recover attorneys' fees incurred in defending against suits and settling claims which are a direct and proximate result of the contractor's breach of his contract, and for which the surety had given a bond to indemnify the owner against any loss or damage arising by the failure of the contractor to faithfully perform his contract, and for the payment in full of the claims of all persons performing labor upon, or furnishing materials to be used in, the work. Tally v. Ganahl, 151 Cal. 418, 90 P. 1049 (1907); Bird v. American Surety Co., 175 Cal. 625, 166 P. 1009 (1917); Cohn v. Smith, 37 Cal.App. 764, 174 P. 682 (1918). See 46 Cal.Jur.2d Suretyship and Guaranty Sec. 69 (1959).

Accordingly, the Court grants defendants' request for judgment against plaintiff for their attorneys' fees incurred in the defense and settlement of lien claims. The Court requests defendants to first attempt to settle the amount of reasonable attorneys' fees with plaintiff and them, if agreement is not reached, to submit it to the Court for a determination.

## ATTORNEYS' FEES IN THE INSTANT ACTION

■ As to whether defendants are entitled to attorneys' fees incurred in the present action, defendants rely most heavily on the ground that this Court, sitting in equity, has the inherent power and should award them attorneys' fees. The Court is satisfied that under California law defendants are not entitled to attorney fees. Viner v. Untrecht, 26 Cal. 2d 261, 158 P.2d 3 (1945). See 8 Cal. Jur.2d Bonds Sec. 88 (1959).

It is true that in a number of cases involving diversity jurisdiction, a federal court has awarded attorneys' fees even though state law did not so provide. Palomas Land and Cattle Co. v. Baldwin, 189 F.2d 936 (9th Cir. 1951); Bank of China v. Wells Fargo Bank & Union Trust Co., 209 F.2d 467 (9th Cir. 1953); Angoff v. Goldfine, 270 F.2d 185 (1st Cir. 1959); Taussig v. Wellington Fund, Inc., 187 F.Supp. 179 (D.Del.1960).

■ The basis of such an award appears to be that in a suit in equity, where the taxation of such costs is essential to the doing of justice, they may be allowed in exceptional cases. Assuming that this Court does have the inherent power to award attorneys' fees incurred in this action, it is the opinion of this Court that it is not essential to the doing of justice that defendants be granted their attorneys' fees. The Court is of the opinion that the bringing of this suit by plaintiff was not in bad faith, vexatious or exceptional. And, on one point, the size of the 10 per cent retention fund, the Court ruled in favor of plaintiff.

Accordingly, it is the conclusion of the Court that defendants not have judgment against plaintiff for their attorneys' fees incurred in the instant action.